STATE OF NORTH CAROLINA v. CHARLES SAMUEL BRUNO

No. 915SC832

(Filed 5 January 1993)

1. **Evidence and Witnesses § 2211 (NCI4th)— DNA test results— changing procedures—admissibility**

   DNA test results were not inadmissible because the FBI's testing procedure is still changing where an FBI expert in DNA testing testified that there had been no significant changes in the testing procedures and that he would interpret the case the same way now as he did when the original tests were conducted, and two other expert witnesses testified that the underlying procedures were reliable.

   **Am Jur 2d, Evidence § 370; Expert and Opinion Testimony §§ 278, 300; Rape §§ 61, 68.**

   **Admissibility of DNA identification evidence. 84 ALR 4th 313.**

2. **Evidence and Witnesses § 2211 (NCI4th)— DNA experts— different results—jury question**

   Where two DNA experts reached differing results based on independent analyses, it was for the jury to weigh the DNA evidence.

   **Am Jur 2d, Expert and Opinion Testimony §§ 129-135.**

3. **Evidence and Witnesses § 672 (NCI4th)— objection to testimony—similar evidence admitted without objection— waiver of objection**

   The benefit of defendant's objection to testimony by two expert witnesses was lost when similar testimony by a third expert witness was thereafter admitted without objection.

   **Am Jur 2d, Appeal and Error §§ 601-604; Trial §§ 413, 420.**

4. **Evidence and Witnesses § 2211 (NCI4th)— DNA testing—FBI errors—exclusion of specific case—harmless error**

   Where defendant's DNA expert was permitted to testify by deposition that there have been cases where false positives incriminated innocent suspects by mistake and that the FBI had admitted making errors in two cases which he named,

any error committed by the trial court in excising the expert's testimony about a specific third case was harmless.

**Am Jur 2d, Appeal and Error §§ 778, 800.**

5. **Evidence and Witnesses § 2211 (NCI4th)— DNA testing— inconclusive results—testimony not improper**

A DNA expert was not improperly permitted to give unsupported testimony that the upper bands of the fourth probe were a match where he did not testify that streaking indicated there was a match among the upper bands of the fourth probe but merely explained to the jury why streaks appeared on the x-ray, and he specifically testified that the upper bands were inconclusive.

**Am Jur 2d, Expert and Opinion Testimony §§ 33, 34, 36.**

6. **Evidence and Witnesses § 2176 (NCI4th)— standard for scientific evidence—opinion excluded**

The trial court did not err in sustaining the State's objection to a question asking the State's DNA expert his opinion concerning the exactness required of a scientific test used to deprive someone of his liberty since the N.C. Supreme Court has already adopted a standard to determine when a scientific test may be used to deprive a defendant of his liberty.

**Am Jur 2d, Expert and Opinion Testimony § 136.**

7. **Rape and Allied Offenses § 5 (NCI3d)— second degree rape— sufficient evidence of slight penetration**

The State's evidence of slight penetration was sufficient to withstand defendant's motion to dismiss a charge of second degree rape where the victim testified that defendant attempted to have sex with her but couldn't because, in defendant's words, she was "too tight," and the examining physician testified that he discovered a bruise around the right upper part of the lips of the vaginal vault in the entrance to the vagina consistent with vaginal penetration.

**Am Jur 2d, Rape §§ 3, 113; Trial §§ 901-904.**

Appeal by defendant from judgment entered 25 June 1990 by Judge James R. Strickland in New Hanover County Superior Court. Heard in the Court of Appeals 10 November 1992.

Defendant was indicted and convicted of the following crimes: second degree sex offense, second degree rape and first degree burglary. The charges were consolidated for judgment and defendant was sentenced to a thirty-nine year prison term with the North Carolina Department of Correction.

The State's evidence tended to show the following: The victim's mother lived with her husband and her three children in a town home at Forest By The Sea at Carolina Beach, North Carolina. The victim, the eldest of the three children, lived in a bedroom on the first floor. Her mother lived in a bedroom on the second floor. The victim's father, a Merchant Marine, was frequently away from the home for extended periods of time.

The State's evidence also tended to show that the victim's mother knew the defendant for about three years prior to the date of trial and had had a "relationship" with the defendant for about two years. During their relationship the defendant visited the victim's mother at least once a week in her home. The defendant was familiar with each of the rooms in the home, knew each of the children, and often put the two youngest children to bed. Several times the defendant scaled the back of the town home to reach the balcony outside the victim's mother's bedroom. Once there, he would tap on the sliding glass door. The victim's mother stopped seeing the defendant after the two "started having a lot of problems" in October or November 1988.

The victim's mother testified that on 5 April 1989 she left her children at home between 8:30 p.m. and 9:00 p.m. and went to meet some friends at Adams, a local lounge. Once there, she found the defendant talking with her friends inside the lounge. A short while later, the victim's mother decided to go next door to Harvey's, a lounge at the Ramada Inn. Before she left, the defendant asked her if one of her friends was her new boyfriend. She replied that he was not, and the defendant "said something to the effect that you will get yours." The victim's mother ignored the defendant and left with her friends.

About an hour after the victim's mother arrived at Harvey's she received a phone call from her daughter, the victim. When she answered the call the victim said, "Mommy, Chuck [the defendant] was here . . . . He raped me[.]" The victim's mother immediately went home. When she arrived at home she noticed that the victim had bruises on her face and neck and that there was a white

streak on her cheek. The victim again told her that the defendant had raped her.

The victim's mother also testified that when she left to go to the lounge earlier that evening she had left her bedroom window open and had closed but not locked her bedroom's sliding glass door. When she arrived back home, the sliding glass door in her bedroom was open and both her bedroom and the victim's bedroom had been left "upside down[.]"

The victim testified that on 5 April 1989 she fell asleep on her bed after watching television. Her bedroom window was open. The victim was asleep on her stomach when she felt someone jump on her back and strike her in the back of the head. Her attacker covered her face, picked her up by her arm, flipped her over onto her back, and told her, "Don't move or scream or I will kill you and cut you up into pieces." He also called her by her first name several times. The victim recognized the attacker's voice, his cologne and the odor of cigarette smoke as that of the defendant. After threatening her and calling her by name the defendant took off the victim's underpants and climbed onto the bed. The defendant attempted to have sex with the victim but was unable and said, "You are too tight." The defendant got mad, hit the victim and "asked [her] to play with his thing." The defendant then told the victim "to put his penis in [her] mouth." The victim complied, but bit down very hard. The defendant became angry again and began choking the victim. The defendant then said, "If you move or scream I will cut you up into pieces." The defendant left the victim's room and quickly ran up the stairs to her mother's bedroom. After the attack "[s]perm was all over [the victim's] face and in [her] mouth, [and] on the side of [her] face." A short while later, the victim got up, looked at herself in the bathroom mirror and then ran to the kitchen where she picked up a knife and dialed 911. After the police arrived, the victim called her mother and was later taken to the hospital. The victim was fourteen years old at the time of the attack.

Dr. Spicer, an expert in the field of emergency medicine, testified that he examined the victim in the early morning hours of 6 April 1989. During his examination, he found multiple bruises around the victim's head and neck including linear marks around her neck suggesting that force had been used to control her neck. Dr. Spicer also found a white stain on the right side of her jaw that fluoresced

under black light suggesting the presence of sperm. The victim's teeth were tender, particularly the two upper front teeth. Dr. Spicer also performed a visual pelvic exam on the victim which revealed a bruise around the right upper part of the lips of the vaginal vault in the entrance to the vagina consistent with vaginal penetration.

Sgt. Still, then a detective with the Carolina Beach Police Department, testified that around 1:30 a.m. on 6 April 1989 he received a call from Det. Hall of the Kure Beach Police Department requesting help with the investigation of a rape case. Det. Hall picked up Sgt. Still and the two men went to the victim's home. Sgt. Still entered the home, collected various items for evidence including the victim's bed linens, a pair of female panties which were lying next to the bed on the floor and a stuffed animal which appeared to have stains on it. Sgt. Still attempted to lift fingerprints from various places throughout the home, but was unable to obtain any prints that were not smudged. Sgt. Still and Det. Hall then went to the hospital where Sgt. Still obtained the victim's nightgown and rape kit which included blood samples. After speaking with the victim, Sgt. Still and Det. Hall obtained an arrest warrant for the defendant and went to Camp Lejeune where they picked him up. Sgt. Still later "obtained a search warrant to obtain a suspect kit" on the defendant. Sgt. Still took the defendant to a hospital and a physician completed "a standard suspect evidence collection kit" which included taking a blood sample. During the physician's examination of the defendant, he noticed marks on the defendant's penis. However, because the marks appeared to the physician to be 24 hours old, no pictures were taken. The next day Sgt. Still packaged the evidence that he had collected, including the night gown and blood samples, and took it to the State Bureau of Investigation's lab in Raleigh.

Peter Deaver, a Special Agent with the SBI and an expert in the field of forensic serology, testified that he conducted tests on the evidence collected by Sgt. Still. A microscopic examination of the victim's gown revealed the presence of spermatozoa. Agent Deaver cut the stain out of the night gown and typed it in order to compare it to blood samples. He determined that the defendant, the victim and her attacker were all ABO type A secreters. However, because bodily fluids can become mixed when a penis is inserted into the mouth of another person, Agent Deaver was unable to make a comparison of the semen stain with the defendant's blood

sample. After conducting these tests, Agent Deaver made dried blood stains of the blood of both the victim and the defendant. The stains, together with a cutting from the night gown containing the semen stain, were marked, packaged and sent to the FBI laboratory for further analysis. The remaining evidence was returned to Sgt. Still. The cheek swabs, the bed linens, the pillow case, the stuffed bear, the vaginal smear, the vaginal swab and the saliva swab of the victim all tested negative for the presence of semen.

After a lengthy *voir dire* hearing the State presented DNA evidence over the defendant's objection. Dr. Harold Deadman, Jr., a Special Agent with the Federal Bureau of Investigation and an expert in the field of DNA analysis, testified for the State. Dr. Deadman explained that DNA, a substance present in each cell of a living organism, contains information controlling the characteristics of organisms from their hair color to their personality and intelligence. Dr. Deadman testified that, with the exception of identical twins, DNA is considered to be unique to each individual. Dr. Deadman also testified that the purpose of DNA analysis is to be able to make a meaningful association or establish a link between different individuals or between a person and a physical object. Dr. Deadman explained the procedure for conducting an analysis of DNA and how that procedure was developed and validated. The procedure involves the use of radioactive DNA probes and results in an x-ray film on which "bands" appear.

Dr. Deadman testified that he received two dried blood stains and a cutting from the victim's night gown from Special Agent Deaver. A DNA analysis was performed on the evidence. During the analysis four probes were conducted which resulted in four x-rays to be used for comparison. According to Dr. Deadman, the first, second and third probes resulted in matches between the stain on the night gown and the defendant. The fourth probe revealed a match among "bottom bands" while the "top band" was inconclusive. Dr. Deadman testified that he did not find any evidence to exclude the defendant as the victim's attacker. Dr. Deadman also testified, over the defendant's objection, that "[t]he four probe result is the basis of a much stronger association than any of the results taken individually." He elaborated, "[t]aken individually they are each the basis for an association and a meaningful association. When they are taken all together it's the basis for an extremely strong association."

STATE v. BRUNO

[108 N.C. App. 401 (1993)]

Dr. Wesley Kloos and Dr. Mark Nelson also testified as experts on behalf of the State. Dr. Kloos testified that he had reviewed the results of the four probes and agreed that each of the first three probes matched and that the fourth probe's lower band matched while the upper band was inconclusive. Dr. Kloos also testified that there is "[a] greater significance when there is more than one probe matching." Dr. Nelson testified that he reviewed the case file on the defendant and that he found the first three probes to be matches while the fourth probe was inconclusive. Dr. Nelson also testified that "every time you add an extra probe and get an additional match it further strengthens the significance of your analysis."

The defendant, a Marine stationed at Camp Lejeune, testified in his own behalf. He arrived at Adams lounge around 9:30 p.m. on 5 April 1989. While there he agreed to be the third contestant in a "honey dip roll of money contest" or a "money honey roll contest." He stayed at Adams until the second contest had been completed and he found out that another contestant had been found for the third contest. Defendant testified that while at Adams he drank approximately seven beers "[b]ecause I was going to be in the contest and I wanted to get my nerve up to get the dollar bills taken from me from the female." The defendant left Adams about 12:30 or 12:40 a.m. and headed back toward Camp Lejeune. On his way back, the defendant stopped at a Handy Mart where he bought coffee and cigarettes. The defendant then drove to his barracks. The defendant changed clothes, went to the duty hut to see if he had any messages, returned to his barracks and went to bed. The defendant was awakened at approximately 4:00 a.m. by military police who took him to the Provost Marshal's Office, where he was later arrested.

The defendant denied going to the victim's home on the evening in question and denied having physical contact with the victim. The defendant testified that the reason he had climbed up and down from the balcony during his relationship with the victim's mother was because the victim's mother wanted to hide their relationship from the victim. The defendant also testified that his private investigator found out that the cameras at the Handy Mart were non-operational and were there just to make people think they were being filmed. Finally, the defendant explained the marks on his penis as being "burn marks from making love."

The defendant also presented testimony to corroborate his alibi. Debbie Golf testified that she saw the defendant at Adams lounge around 10:30 or 11:00 p.m. right before the second "honey dipping contest" and talked to him for about ten or fifteen minutes. Debra Britt testified that she saw the defendant at Adams lounge at about 12:15 or 12:20 a.m. on 6 April 1989. Larry Anderson testified that he was standing duty NCO at Camp Lejeune on the night of 5 April 1989. He saw the defendant come into the duty hut shortly after 2:10 a.m. on 6 April 1989. Finally, Mark Perry, a private investigator, testified to the length of time it would take to drive from Adams to Forest By The Sea and from Forest By the Sea to Camp Lejeune. The cumulative effect of this testimony was to show that the defendant could not have driven from Adams to Forest By The Sea and then to Camp Lejeune in time to be seen by Mr. Anderson at 2:10 a.m.

The defendant also presented deposition testimony of Dr. Steven C. Peiper, an expert in the field of molecular biology and pathology with particular expertise with DNA. By deposition, Dr. Peiper testified that based on the FBI's criteria for a match probes 1, 2 and 3 were matches. Probe 4, however, was not a match and indicated that the DNA specimen from the gown came from someone other than the defendant. Dr. Peiper also testified that he re-analyzed the first three probes himself and determined that only the first two were in fact matches. He testified that this indicated that the defendant was not the source of the genetic material.

*Attorney General Lacy H. Thornburg, by Assistant Attorney General Valerie B. Spalding, for the State.*

*Nora Henry Hargrove for the defendant-appellant.*

EAGLES, Judge.

I

At the outset we note that the defendant raises twenty-two assignments of error. However, because the defendant has failed to bring forward assignments 1, 2, 5, 6, 8, 10, 11, 12, 14, 17, 18, 19, 21 and 22 in his brief, they are deemed abandoned. N.C.R. App. Pro. 28(b)(5).

STATE v. BRUNO

[108 N.C. App. 401 (1993)]

II

By way of his third and fourth assignments defendant argues that the trial court committed reversible error by admitting DNA evidence. Specifically, defendant argues the evidence should have been excluded because: (1) the FBI's procedures are unreliable because they are in a state of flux and the results are not reproducible and (2) the trial court failed to resolve conflicts in the expert DNA testimony. We disagree.

In *State v. Pennington*, 327 N.C. 89, 393 S.E.2d 847 (1990), our Supreme Court determined that DNA evidence was sufficiently reliable to be admitted into evidence. In so determining, the Court

> focused on the following indices of reliability: the expert's use of established techniques, the expert's professional background in the field, the use of visual aids before the jury so that the jury is not asked to "sacrifice its independence by accepting [the] scientific hypotheses on faith," and the independent research conducted by the expert.

*Id.* at 98, 393 S.E.2d at 853 (citation omitted). However, that admission was not without qualification.

> The admissibility of any such evidence remains subject to attack. Issues pertaining to relevancy or prejudice may be raised. For example, expert testimony may be presented to impeach the particular procedures used in a specific test or the reliability of the results obtained. *See, e.g.,* *People v. Castro*, 144 Misc. 2d 956, 545 N.Y.S.2d 985 (1989). In addition, traditional challenges to the admissibility of evidence such as the contamination of the sample or chain of custody questions may be presented. These issues relate to the weight of the evidence. The evidence may be found to be so tainted that it is totally unreliable and, therefore, must be excluded.

> *State v. Ford*, --- S.C. at ---, 392 S.E.2d at 784. *See also* *State v. Schwartz*, 447 N.W.2d 422, 428 (Minn. 1989) . . . .

*Id.* at 101, 393 S.E.2d at 854. We read *Pennington* to hold that a trial court may decide as a matter of law that DNA evidence is inadmissible for any number of reasons including, but not limited to, unreliable procedures or results, contamination of the sample or chain of custody questions. However, where unfair prejudice

is not clear and where there is merely conflicting expert testimony regarding interpretation of the DNA evidence or where two experts have reached differing results based on independent analyses of the DNA, the issue becomes one of credibility of the experts. In that situation the jury is obligated to determine what weight each expert's testimony should receive.

**[1]** Here, the defendant first argues that the procedures used by the FBI were unreliable because they are in a state of flux. More specifically, defendant argues that "[a]lthough the underlying procedure may be reliable, . . . the F.B.I.'s witness showed that the procedure was still changing." The State correctly points out in its brief that the "[d]efendant appears to have overlooked the commonly known fact that most or all scientific procedures are constantly being refined in an effort to improve man's knowledge. If this were not so, our knowledge of ourselves and our universe would be both minimal and static."

The critical question here is not whether the DNA procedures were changing, but whether the changes that have been made by the FBI demonstrate that the earlier procedures, which were used in the instant case, were so unreliable that the trial court should have completely excluded the evidence. The defendant admits in his brief that both Dr. Kloos and Dr. Nelson testified that the underlying procedures were reliable. Moreover, Dr. Deadman, the FBI's expert, addressed the concerns of the defendant. Dr. Deadman testified that there had been no significant changes in the testing procedures and that he would interpret the case the same way now as he did when the original tests were conducted. Defendant's argument is without merit.

**[2]** Defendant next argues the FBI's procedures were unreliable because "Dr. Peiper was unable to reproduce their match analysis." Where two experts have reached differing results based on independent analyses, the jury is left to weigh the evidence. This argument is also without merit.

Finally, under this assignment, the defendant argues that the trial court erred by concluding that the DNA evidence was reliable. Specifically, defendant argues that the trial court erred by failing to resolve conflicts in expert testimony regarding interpretation of the fourth probe. Once again, this was an issue properly left to the jury. Accordingly, this argument is overruled.

STATE v. BRUNO

[108 N.C. App. 401 (1993)]

III

[3]   By way of his seventh assignment of error defendant argues that the trial court erred by allowing both Dr. Deadman and Dr. Kloos to testify that the combined results of the several probes resulted in a stronger and more significant association than any one of the probes taken individually. However, the defendant failed to object when Dr. Nelson subsequently testified giving substantially the same testimony. "It is well settled that where evidence is admitted over objection, and the same evidence is later admitted without objection, the benefit of the objection is lost." *State v. Beasley*, 104 N.C. App. 529, 532, 410 S.E.2d 236, 238 (1991) (citing *State v. Whitley*, 311 N.C. 656, 319 S.E.2d 584 (1984)). This assignment is overruled.

IV

[4]   Defendant argues in his sixteenth assignment of error that the trial court erred by excising portions of Dr. Peiper's deposition testimony. We disagree.

Defendant first argues that the trial court erred by excising Dr. Peiper's testimony regarding the case of *People v. Castro*, 144 Misc. 2d 956, 545 N.Y.S.2d 985 (1989). Defendant contends that Dr. Peiper should have been allowed to testify about the facts and name of the specific case to illustrate to the jury that DNA "tests are not infallible." According to defendant, if the jury heard a specific case name, "the idea of scientific fallibility [would] become[ ] real."

Assuming *arguendo* that the trial court committed error by excising the testimony, any error committed was harmless. Dr. Peiper was allowed to testify that there have been cases where false positives incriminate innocent suspects by mistake. Moreover, Dr. Peiper was allowed to testify that he was aware that the FBI had admitted making errors in two specific cases, *Iowa v. Smith* and *New Mexico v. Anderson*. This argument is overruled.

Defendant next argues that the trial court erred by excluding Dr. Peiper's testimony concerning the shortcomings of the FBI's data base. At trial the defendant made a motion in limine to prevent State witnesses "from making any reference to any numerical figure in connection with the DNA testing . . . [because] the [FBI's] data base for attaching a numerical probability figure is inadequate and insufficient." The trial court allowed the defendant's motion in limine.

The defendant now argues that because the trial court allowed the State's experts to testify that matches of multiple probes are more significant than a match of an individual probe, the trial court violated its own ruling and forced the defendant 'to choose between opening the door to statistical evidence of a match by impeaching the FBI's data base and "try[ing] to cut his losses by not allowing invalid and misleading number crunching to be introduced." We have already determined that defendant here failed to properly preserve for our review the issue of whether the testimony regarding the significance of multiple matches was proper. Accordingly, we do not address that issue again. Furthermore, we note that it was the defendant who sought to exclude statistical evidence of a match because the FBI's data base was allegedly inadequate. He cannot now complain that his own expert was not allowed to testify to impeach the very data base evidence that he successfully asked be excluded. "A defendant is not prejudiced by the granting of relief which he has sought or by error resulting from his own conduct." G.S. 15A-1443(c); e.g. State v. Patterson, 332 N.C. 409, 420 S.E.2d 98 (1992). Accordingly, this assignment is overruled.

V

[5] In his ninth assignment of error, the defendant argues that the trial court erred by allowing Dr. Deadman to testify that the fourth probe was inconclusive because the probative value of that evidence was outweighed by its prejudicial effect. We disagree.

During direct examination, Dr. Deadman testified that his examination of the fourth probe revealed that the bottom bands of the probe were a match. The upper bands, however, were inconclusive due to DNA degradation. In fact, Dr. Deadman testified that the upper four bands were essentially invisible. Dr. Deadman also testified that there was "streaking from the position of the defendant's upper band . . . being consistent with degraded DNA." Dr. Deadman, over objection, explained the streaking as follows:

> In order for an exposed area to develope [sic] in a piece of x-ray film the probe has to bind to something. The probe is only going to bind to particular pieces that have the sequence that it recognizes.

> The probe is, in fact, binding to something in this upper region. If there were no bands above this lower band the

probe would not be expected to bind to any great extent at that point and so the streaking from, from this upper point on down is consistent with something being there even though a distinct band cannot be seen.

Defendant argues that he was unfairly prejudiced by this testimony because Dr. Deadman was allowed to testify that there were matching bands when in fact there simply was no evidence to support his testimony. We disagree with defendant's interpretation of Dr. Deadman's testimony. Dr. Deadman did not testify that the streaking indicated there was a match among the upper bands of the fourth probe. Rather, his testimony merely explained to the jury why streaks appeared on the x-ray. Moreover, Dr. Deadman specifically testified that the upper bands were inconclusive. This assignment is overruled.

## VI

[6] By his thirteenth assignment defendant argues that the trial court committed reversible error by limiting the cross-examination of Dr. Kloos. At trial the following exchange occurred:

Q. You heard Dr. Deadman testify that even using computers and television cameras that the bands cannot be measured exactly?

A. Correct.

Q. So this is not an exact science by any means?

A. I look at the whole area of biology as perhaps a little less exact than physics, for example, if that's what you are using. I am surmising you may be using it as a standard for an exact science if there is such a beast.

Q. Do you think it is too much to demand with someone's liberty is at stake that the test be —

Ms. HOLT: Objection.

COURT: That objection is sustained.

A: I think —

Ms. HOLT: You don't need to answer.

COURT: Wait for the next question.

Defendant argues that the trial court's ruling effectively prevented him from properly developing "[t]he concept of scientific error in a forensic setting and its consequences. . . ." We disagree.

First, it should be noted that Dr. Kloos earlier testified that DNA is not yet automated and, therefore, is only as good as the people performing the tests. Second, the testimony which the defendant sought to elicit from Dr. Kloos is irrelevant here. Regardless of what standard Dr. Kloos feels should be applied, our Supreme Court has already adopted a standard to determine when a "scientific test" may be used to deprive someone of their liberty. *E.g.,* *State v. Bullard*, 312 N.C. 129, 322 S.E.2d 370 (1984). This argument is wholly without merit.

## VII

[7] Defendant next argues, in his fifteenth assignment of error, that the trial court erred by denying his motion to dismiss the charge of second degree rape because there was no evidence of vaginal penetration. We disagree.

> In ruling on a motion to dismiss for insufficient evidence the trial court must consider the evidence in the light most favorable to the state, which is entitled to every reasonable inference which can be drawn from that evidence. *State v. Bell*, 311 N.C. 131, 138, 316 S.E.2d 611, 615 (1984). There must, however, be substantial evidence of each essential element of the offense charged, together with evidence that the defendant was the perpetrator of the offense. *State v. Gardner*, 311 N.C. 489, 510-11, 319 S.E.2d 591, 605 (1984).

*State v. McNicholas*, 322 N.C. 548, 556-57, 369 S.E.2d 569, 574 (1988).

In order for a charge of second degree rape to withstand a motion to dismiss, evidence of vaginal intercourse must be presented. G.S. 14-27.3 (1986)."The slightest penetration of the female sex organ by the male sex organ is sufficient to constitute vaginal intercourse within the meaning of the statute." *McNicholas*, 322 N.C. at 556, 369 S.E.2d at 574 (1988). "It is not necessary that the vagina be entered or that the hymen be ruptured; the entering of the vulva or labia is sufficient." *State v. Murry*, 277 N.C. 197, 202, 176 S.E.2d 738, 742 (1970).

STATE v. BRUNO

[108 N.C. App. 401 (1993)]

Here, the victim testified that the defendant attempted to have sex with her but couldn't because in the defendant's words, she was "too tight." Dr. Spicer testified that when he examined her he discovered a bruise around the right upper part of the lips of the vaginal vault in the entrance to the vagina consistent with vaginal penetration. This testimony was clearly sufficient on the issue of penetration to withstand the defendant's motion to dismiss. This assignment is overruled.

## VIII

Defendant finally argues in his third, fourth, and twentieth assignments that admission of DNA analysis in the forensic setting is premature and deprived the defendant of his right to due process and a fair trial. To support this assignment, the defendant points to a number of "issues" raised by literature in the field. However, the defendant also concedes that our Supreme Court has already decided that North Carolina's courts are generally open to the admission of DNA evidence. *State v. Pennington*, 327 N.C. 89, 393 S.E.2d 847 (1990). Of course, the reliability of DNA evidence may be questioned in any given case. *Id.* This assignment does not bring forward a specific objection to the admission of DNA evidence in this case, but rather challenges its general admissibility. We are bound by the holding in *Pennington*. Accordingly, this assignment is overruled.

## IX

Finally, we note that we are not directly confronted with the troublesome issue of whether the FBI's data base is sufficiently broad to allow introduction of evidence concerning the statistical probability that a given defendant is the perpetrator of a charged offense. Accordingly, we do not address it here.

No error.

Judges PARKER and ORR concur.