**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CHARLES SAMUEL BRUNO,
Petitioner-Appellant,

v.                                                        No. 96-6462

FRANKLIN R. FREEMAN; RANDY LEE,
Respondents-Appellees.

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Terrence W. Boyle, District Judge.
(CA-95-612-HC)

Argued: October 28, 1996

Decided: April 14, 1997

Before WILKINS and LUTTIG, Circuit Judges, and
PHILLIPS, Senior Circuit Judge.

_____

Affirmed by unpublished opinion. Senior Judge Phillips wrote the
opinion, in which Judge Wilkins and Judge Luttig joined.

_____

**COUNSEL**

**ARGUED:** Nora Henry Hargrove, Wilmington, North Carolina, for
Appellant. Clarence Joe DelForge, III, Assistant District Attorney,
Raleigh, North Carolina, for Appellees. **ON BRIEF:** Michael F. Eas-
ley, Attorney General of North Carolina, Raleigh, North Carolina, for
Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PHILLIPS, Senior Circuit Judge:

Charles Samuel Bruno appeals the district court's dismissal by summary judgment of his federal habeas petition challenging his conviction by a North Carolina court of several sexual assault-related offenses. His specific challenge is to the constitutionality of the state court's treatment of DNA evidence used against him. We find no reversible error in the dismissal of his petition and affirm.

I.

The sordid facts of the case are reported in detail in the opinion of the North Carolina Court of Appeals, see State v. Bruno, 424 S.E.2d 440 (N.C. App. 1993), and need not be repeated in that detail here. It suffices for our purposes to say only that Bruno was convicted in a state court jury trial and sentenced to thirty-nine years imprisonment for first-degree burglary, second-degree rape, and second-degree sexual offense on evidence that he forced his way at night into the residence of a married woman with whom he had had a sexual relationship, and there sexually assaulted her fourteen-year-old daughter who had been left there with two younger children by her mother. In convicting him, the jury rejected his alibi defense and found him guilty on the basis of his victim's identification, some circumstantially corroborating evidence as to his whereabouts and conduct on the evening of the assault, and evidence linking samples of his DNA to semen found on the victim's nightclothing. It is entirely upon the state court's handling of the DNA evidence and expert witness testimony offered to support and to challenge its admissibility and probative value that Bruno's federal habeas challenge is based. We therefore briefly summarize the critical aspects of those evidentiary developments in the state court trial.**1**

_____

**1** In doing so, we emphasize that our summary involves much paraphrase and compression of the extensive portions of the state trial court

2

The DNA evidence in question resulted from FBI testing to determine whether DNA fragments extracted from a blood sample taken from Bruno shortly after the assault matched those extracted from a patch of semen found on the victim's nightgown. Aware that the test results were considered positive for inferring identification by the FBI testers and would be offered in evidence for that purpose by the state, Bruno moved at trial for an order excluding in limine any testimony by expert witnesses for the state that would assign, on the basis of the FBI testing procedures, any statistical probability to the chance matching of DNA profiles, and also moved for suppression of any evidence respecting the actual DNA testing by the FBI of the blood and semen samples provided it by the state. After an extensive voir dire proceeding in which live and deposition testimony of expert witnesses for both the state and Bruno was considered, the state trial court granted Bruno's motion to exclude in limine any expert testimony as to statistical probabilities of chance matchings of DNA profiles based upon FBI test procedures, but denied the motion to suppress all evidence of the actual tests done and the results achieved by the FBI using the samples provided it by the state.

Following these rulings, the state introduced documentary and testimonial evidence concerning the FBI's DNA testing of the samples in issue. The critical evidence for our purposes was the testimony of three duly qualified experts in the relevant scientific fields who described in general the DNA matching procedures used by the FBI and specifically analyzed the results of the test conducted under those procedures to determine whether Bruno's DNA matched that extracted from the semen sample.

First, Dr. Harold Deadman, Jr., Supervisory Special Agent with the FBI laboratory that performed the test, described in general the test procedures used, their purposes, and how they were developed and validated. He then described the conduct and results of the test procedures as applied to the DNA samples at issue. In summary, he testified, over objection, using exhibits of the test materials, that of four testing "probes" done to determine whether different fragments of

_____

record devoted to the court's handling of the DNA evidence. We include only so much of a quite lengthy record as is required to address the specific constitutional challenges raised in this federal habeas proceeding.

3

DNA strands extracted from Bruno's blood sample matched those extracted from the semen sample, each indicated a match, though one with less visual clarity than the others because of some degradation of the target DNA. Explaining that because of the fragmentary nature of the DNA strands used in these procedures such matching results were not claimed to provide the basis for an "absolute identification," he opined that "taken individually," the four matching results in this case did each, however, provide the basis for a "meaningful association" or "link" between Bruno and the semen sample and, that "taken all together" they provided the basis for an "extremely strong association" in that they positively demonstrated that the semen "could have been contributed" by Bruno while none of the probe results positively excluded him as its source. J.A. 395-435.

Dr. Wesley Kloos, a professor of genetics and microbiology at North Carolina State University, testified that he was familiar with the FBI testing procedures as described by Dr. Deadman, and opined that they were capable of producing reliable results in identifying matches between different DNA samples. Turning to the test results at issue, he testified that he had examined them independently and upon again examining them, he essentially concurred with Dr. Deadman's opinion that each of the four probes revealed a match of the DNA from Bruno's blood sample with that from the semen sample, though again with less certainty as to one having degraded DNA. Over objection, he opined that "the more probes that one has identity or matches for[,] the higher the probability of the determination." J.A. 503-519.

Mark Steven Nelson, holder of a master's degree in biology and Supervisor of the State Bureau of Investigation's Serology Section, testified that based upon his education, his specialized training in DNA testing, his recent experience with such testing in the Serology Section's DNA unit, and his resulting familiarity with his own agency's procedures and those of the FBI as described by Dr. Deadman, he considered that the FBI procedures met accepted scientific standards of quality assurance. Respecting the specific test results in issue, he testified, based upon his independent examination of the four probe results, that three of the four did demonstrate matches; the one involving degraded DNA he thought inconclusive; and he considered that none, including the inconclusive one, excluded Bruno as the semen source. Without any objection by Bruno, he opined in response

4

to the state prosecutor's question whether there was any significance "as to the combined results of all four probes" that there was: "Every time you do an increased number of probes, every time you add an extra probe and get an additional match it further strengthens the significance of your analysis." J.A. 535-547.

The deposition of Dr. Steven A. Peiper, stipulated to be an expert in molecular biology and pathology, was introduced, in redacted form, in Bruno's defense. Based upon his analysis of the FBI test results, Dr. Peiper concluded that two of the probe results revealed matches, but that neither of the other two did (as to one of the two "bands" of target DNA) a result which in his opinion excluded Bruno as the semen source. J.A. 13. Redacted from his deposition, hence not admitted over Bruno's objection, was Dr. Peiper's further opinion that the FBI's testing procedures were flawed in critical respects that drew their general reliability in doubt, and that the sort of DNA testing for purposes of identification which they involve is not generally accepted in the relevant scientific community.

Following his conviction and sentence, Bruno appealed to the North Carolina Court of Appeals. Among other assignments of error in that court he claimed error in the state trial court's admission vel non of the DNA evidence and, more specifically, in its admission of the testimony of each of the state's expert witnesses that multiple DNA probe matches have greater significance in identifying a suspect than would individual matches, and the court's refusal to admit the deposition testimony of Dr. Peiper which challenged the statistical reliability of the FBI matching procedure because of asserted flaws in the data base upon which it was based. The North Carolina Court of Appeals found no legal or constitutional error in any of these respects and affirmed the conviction. Id. The Supreme Court of North Carolina denied discretionary review without discussion and dismissed Bruno's appeal. State v. Bruno, 428 S.E.2d 185 (N.C. 1993). Bruno did not seek review by the Supreme Court of the United States nor any state post conviction relief, but sought federal habeas corpus relief under 28 U.S.C. § 2254 by petition to the United States District Court for the Eastern District of North Carolina. In his petition, he claimed constitutional error in the various evidentiary rulings we have identified. The district court dismissed the petition on the state's motion for summary judgment, holding, inter alia , that the claimed

5

errors were all of the trial type which raise no cognizable issues on federal habeas review unless they go to the fundamental fairness of a state trial or implicate a specific federal constitutional right. And, the court concluded that none of the claims of error respecting the DNA evidence raised cognizable constitutional issues. Bruno v. Freeman, No. 5:95-NC-612-BO (E.D.N.C. Feb. 19, 1996) (order granting summary judgment).

This appeal followed.

II.

Preliminarily, we observe that the state contends that the relatively more deferential standards for federal habeas review of state court judgments embodied in the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996) (the Act), should be applied in this case which was pending when the Act was adopted. Bruno has not challenged that contention, but we find it unnecessary to address the question of the Act's retroactivity in this respect, concluding that Bruno's claims were properly dismissed even if assessed under pre-Act standards. See Sherman v. Smith, 89 F.3d 1134, 1142 n.1 (4th Cir. 1996) (en banc).

III.

Bruno makes three challenges, which he asserts are constitutionally based, to the state trial court's handling of the DNA evidence.

First, he challenges the court's refusal to admit the portion of Dr. Peiper's deposition that questioned the reliability in general of all DNA matching analysis, and specifically that of the FBI procedures employed in this case. This, he claims, violated his rights under the Confrontation Clause of the Sixth Amendment to impeach the state's expert witnesses' testimony that each of the probe matches suggested a "link" or "association" between Bruno and the semen sample and that multiple probe results were even more significant for that purpose. Appellant's Br. i, 11-22. Next, he challenges on fundamental fairness/due process grounds the admission of the testimony of the state's expert witnesses to the effect that as the number of probe result

6

matches increases, so does their probative significance. Appellant's Br. i, 22-25. Finally, he challenges, on fundamental fairness/due process grounds, the admission vel non of any of the DNA evidence against him, on the basis that its scientific unreliability is demonstrated by the very fact of the conflicting expert analyses of the probe results. Appellant's Br. i, 25-27.

We first observe of all these challenges that they concern state court trial rulings respecting the admission and exclusion of evidence which are cognizable in federal habeas corpus only to the extent that they violate specific constitutional provisions or are so egregious as to render the entire trial fundamentally unfair and thereby violate the due process clause of the Fourteenth Amendment. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Spencer v. Murray, 5 F.3d 758, 762-63 (4th Cir. 1993). And, we further note that the Supreme Court has "defined the category of [such trial court] infractions that violate `fundamental fairness' very narrowly." Dowling v. United States, 493 U.S. 342, 352 (1990). With those general principles in mind, we consider Bruno's challenges in reverse order.

A.

Bruno's contention that unreliability of the DNA evidence, hence fundamental unfairness in its admission, is sufficiently demonstrated by the various experts' different and conflicting readings of the probe results, is not cognizable as a constitutional claim. The fact that conflicts, major and minor, occur in expert witnesses' analyses of scientific evidence is of course a commonplace rather than a rarity in litigation. Such conflicts could not be taken to demonstrate, in and of themselves, the unreliability amounting to fundamental unfairness of admitting such evidence against a criminal defendant. It suffices to uphold the admission vel non of the state's DNA evidence against a claim of fundamental unfairness that duly qualified experts for the state testified to its reliability when based on scientifically sound procedures which they opined were followed in this case. How the specific evidence should be evaluated, given the conflicting testimony as to its probative value, was for the jury as a matter of state law. See Spencer, supra, 5 F.3d at 762-63 (4th Cir. 1993) (upholding admission of comparably based DNA evidence over constitutional challenge to reliability).

7

B.

Bruno's claim of constitutional error in allowing the state's expert witnesses to give their respective opinions that DNA probe matches increase in probative significance as their number increases, is but another challenge to the general reliability of the FBI procedures upon which this testimony was based. Specifically, the contention is that if, as the trial court properly ruled, the procedures were not sufficiently reliable to support evidence of the probability expressed in statistical terms that any DNA matches disclosed were the result of random chance rather than actual identity, then they were not sufficiently reliable to support simple testimony that two test-disclosed matches are more probative of identity than one, three more than two, etc.

Assuming, without deciding, that the trial court rightly thought the FBI procedures not sufficiently reliable (because of their limited data base) to support testimony concerning the statistical significance of any matching results they disclosed, Bruno's claim yet fails for a number of reasons.

First, as the state points out, it is barred from federal habeas review as a constitutional claim by its procedural default in the state court. As indicated, although Bruno objected to the testimony of Drs. Deadman and Kloos as to the increased significance of multiple matches, that of Mark Nelson to the same effect was later admitted without objection. J.A. 546-47. The North Carolina Court of Appeals on direct review expressly found that for this reason Bruno's claim of error on this ground was procedurally defaulted under settled state law. Bruno, 424 S.E.2d at 446. This ruling, the last reasoned one concerning this claim in the state courts, constituted an adequate and independent state ground for rejecting the claim which bars federal habeas review in the absence of any showing of cause and prejudice for the default. Harris v. Reed, 489 U.S. 255, 260 (1989). Bruno has attempted no showing of cause and prejudice.

Assuming, however, that the claim were not held to be barred by an unexcused procedural default in the state court, it could not succeed under the stringent federal due process standard of fundamental unfairness. Even if the FBI procedures were properly held to be inadequate to allow the reliability of their DNA test results to be

8

expressed in terms of the statistical probability that any matches they disclosed were the result of random chance, this would not affect the reliability of simple testimony (whether or not given by qualified experts) that the significance of these (or any) test results increases as the number of like results increases. Indeed, that this is so is a matter of such common knowledge and understanding among persons of ordinary intelligence that to have it attested by a witness could not be thought to introduce any fundamental unfairness into a trial. We are satisfied that it did not do so here.

C.

Bruno's challenge to the state court's exclusion of the deposition testimony of Dr. Peiper that was offered to impeach the state expert witnesses' testimony as to the increased significance of multiple DNA matches is asserted as a Sixth Amendment Confrontation Clause violation. He cites no authority for the proposition that that constitutional right extends past its hearsay and cross-examination components, see Delaware v. Fensterer, 474 U.S. 15, 18 (1985) (so defining scope of right), to include a right to introduce extrinsic evidence impeaching a state's witness.[2] We accordingly analyze the claim as yet another Fourteenth Amendment due process claim of fundamental unfairness in depriving an accused of the means for making a fair defense--a right surely congruent with that protected in its specific realm by the Confrontation Clause. See California v. Green , 399 U.S. 149, 186-187 (1969) (Harlan, J., concurring) (making the comparison).

So analyzed, we conclude it does not constitute a cognizable constitutional claim; the exclusion of this evidence could not be thought to have made Bruno's trial fundamentally unfair. As the state points out, and the state court of appeals expressly noted, see Bruno, 424 S.E.2d at 446-47, the evidence proffered and excluded would have challenged the very FBI data base which Bruno's successful motion in limine had precluded the state from relying upon to demonstrate the

_____

[2] None of the cases expressly relied upon, Delaware v. Fensterer, 474 U.S. 15 (1985); Davis v. Alaska, 415 U.S. 308 (1974); California v. Green, 399 U.S. 149 (1970); Smith v. Illinois, 390 U.S. 129 (1968); Pointer v. Texas, 380 U.S. 400 (1965), involved extrinsic impeaching evidence.

statistical significance of any matching results disclosed by its procedures. To exclude the evidence under those circumstances is better seen as compelled fairness to the state than as fundamental unfairness to an accused who had effectively invited exclusion of any evidence respecting the adequacy or inadequacy of the data base for the purpose at issue. Furthermore, Dr. Peiper was allowed to testify extensively to what he considered to be flaws in the three state expert witnesses' analyses and conclusions respecting the FBI matching test results.

Accordingly, we conclude that Bruno's challenge to the exclusion of this portion of his expert witness's deposition testimony does not constitute a cognizable constitutional claim of fundamental unfairness depriving of due process.

D.

Finally, we observe that even were constitutional error to have occurred in all or any of the "trial-type" evidentiary rulings challenged, that would not warrant federal habeas corpus relief unless the errors were such as to create for us "grave doubt" as to whether they had a "substantial and injurious effect or influence in determining the jury's verdict" in this case. O'Neal v. McAninch, 115 S. Ct. 992, 994 (1995) (citations omitted). Those claimed here do not create any such doubt for us. The other evidence of Bruno's guilt--particularly the victim's contemporaneous identification of Bruno by well-known voice and other characteristics and the use of and response by both attacker and victim to the other's names--was sufficiently persuasive that we could not assign "substantial and injurious effect" upon the jury's verdict to the further evidence of guilt supplied by the DNA test results.

AFFIRMED