STATE OF NORTH CAROLINA v. F. E. RUDOLPH

No. 7810SC749

(Filed 2 January 1979)

1. Solicitors § 1— "career criminal" program—prosecution thereunder not abuse of district attorney's discretion

Defendant's contention that the district attorney's "career criminal" program was essentially a non-legislative enactment of a criminal recidivist law and that prosecution of defendant under the program amounted to a denial of due process and equal protection is without merit since, under his "career criminal" program, the district attorney was implementing a policy of vigorous prosecution using such means as concentrating available manpower on career criminal trials, pursuing tough plea bargaining policies, advocating more restricted pretrial release, and arguing for more severe punishments; these actions were well within the broad prosecutorial discretion recognized by the courts; and the prosecution was not required to provide defendant with a full written description of the "career criminal" program, since G.S. 15A-903 does not entitle defendant to information on the internal policies of the district attorney's office.

2. Searches and Seizures § 11— warrantless search of vehicle and defendant—probable cause—admissibility of evidence seized

Evidence discovered in a search of the car and the person of defendant incident to a warrantless arrest was admissible in a prosecution for robbery with a firearm where the evidence tended to show that officers stopped the car because it matched the description of the robbery suspect's vehicle and they had been informed that the three occupants were suspects in the robbery; moreover, the flight of one of the occupants of the vehicle and the

discovery of what appeared to be the robbery weapon in the plain view of the officers were sufficient to ripen the suspicion of the officers into probable cause to make an arrest.

3. **Robbery § 5.1; Criminal Law § 112.4— jury instructions—erroneous instruction not prejudicial**

   In a prosecution for robbery with a firearm, the trial court's statement that the State must prove that defendant took away "the property of another, with the consent of the owner" was a misstatement obvious to even a lay person and was not prejudicial to defendant in light of the context of the misstatement, the lapse of time from the misstatement until the jury deliberations, and the correct final charge to the jury. Nor was defendant prejudiced by the court's obvious misstatement that the State's evidence must be consistent, rather than inconsistent, with defendant's innocence in order for the jury to find him guilty of the crime charged where such *lapsus linguae* was not called to the attention of the court, and it does not appear that the jury could have been misled by the statement.

4. **Criminal Law § 79— acts of accomplices—admissibility of evidence**

   Evidence with respect to the conduct of defendant's accomplices was admissible in a prosecution for robbery with a firearm and did not deny defendant the right to confront his accusers.

5. **Criminal Law § 60.5— palm print—admissibility of evidence**

   In a prosecution for robbery with a firearm, evidence concerning defendant's palm print found on a stolen cash register was properly admitted.

6. **Criminal Law § 60.2— fingerprint file not admitted—no reference to other crimes—reference to file not inadmissible**

   Defendant's contention that testimony which referred to a fingerprint file on defendant was inadmissible because it amounted to evidence of other distinct or separate offenses committed by defendant is without merit, since the file itself was not passed to the jury and no charges appearing on the file were communicated to the jury.

APPEAL by defendant from *McLelland, Judge.* Judgment entered 15 March 1978 in Superior Court, WAKE County. Heard in the Court of Appeals 29 November 1978.

Defendant was tried on indictments charging him with larceny of a firearm and robbery with a dangerous weapon. The jury returned a verdict of guilty on the charge of robbery with a dangerous weapon and found defendant not guilty of larceny of a firearm.

The evidence is summarized below except to the extent the record is quoted: At about 8:00 p.m. on 29 December 1977, Shirley Holleman (referred to herein as "Holleman") was on duty as cashier at the Variety Pic-Up store in Wake County near Willow Springs. While behind the counter, Holleman was startled by the

presence of three black males. She had not heard a vehicle approach the store. She testified that one of the individuals was short and heavy, wore a stocking over his head, and carried a rifle. The second male was described only as tall, and no description was given of the third person other than that he was a black male. Holleman could not positively identify the defendant as one of the three individuals who robbed the store.

As she was directed to do, Holleman lay down behind the counter, and the man carrying the gun placed it at her head and warned her that if she moved he would "blow her head off". She remained on the floor until Mr. and Mrs. Eddie Wood Thornton entered the store moments later. Holleman stood up and realized for the first time that the cash register had been stolen. Mr. Thornton saw three black males, two of them carrying an object, crossing the road toward a dark colored Oldsmobile. He noticed a black female in the driver's seat and took down the license number of the car. After Thornton entered the store and found Holleman, he proceeded across the street to report the incident to Wake County A.B.C. Officer Leon Smith who was patronizing Olive's Cash Grocery. Smith reported by radio to Wake County Deputy Sheriff Baldwin that the Variety Pic-Up had been robbed and that three males were observed leaving the scene in a dark-colored Oldsmobile driven by a black female. Subsequently, Holleman regained her composure and gave to Smith the same description of the individuals as was later given at trial. These descriptions were reported to the sheriff's department by radio.

Deputy Baldwin heard the robbery report over the radio and recognized the license number which he knew properly belonged to a Katherine Battle and did not belong on the automobile involved in the robbery. Baldwin knew that Willie Jones owned an Oldsmobile fitting the general description of the car seen by Thornton. He also knew where Jones lived, that defendant lived with Jones, and that they both lived in a house with Geraldine Carter. Baldwin also had information that defendant and Clainey McKinney had been "running together". At the time of the report Baldwin knew defendant and had once stated that defendant would "steal anything he got his hands on". From the report and descriptions, Baldwin "was not positive that these people were involved in it but felt like they were involved in it".

Deputy L. M. Council was on duty on 29 December 1977 and was directed by Baldwin to proceed to Prince's Grocery, near defendant's residence and about ten miles from the Variety Pic-Up, to watch for the Oldsmobile. He arrived at about 8:15 p.m. At 8:20 p.m. Council drove to defendant's residence and noted the presence of defendant's yellow 1967 Chevrolet and a 1969 Mercury, but no Oldsmobile. He did not stop to see if anyone was in the house, instead he returned to his post at Prince's Grocery. At the time the deputy passed defendant's house insufficient time had elapsed from the time of the reported robbery for someone to have traveled the ten miles from the Variety Pic-Up. Around 8:30 p.m. Council stopped an Oldsmobile that he soon determined was not the automobile involved in the robbery. Shortly thereafter Council returned to his post at Prince's Grocery and observed defendant's car occupied by three persons. He pursued the automobile along NC 55 to US 1 and onto Hillsborough Street in Raleigh. Council then, through the sheriff department's dispatcher, requested assistance from the Raleigh police, and returned to Holly Springs.

Raleigh Police Officer J. M. O'Shields began following the vehicle at the Raleigh city limits. He observed a black male driver, a black female in the front seat, and a black male in the back seat. He noticed that one of the passengers kept turning around to watch his car. Officers E. O. Lassiter and F. W. Mitchell were also following defendant's vehicle. Defendant's vehicle was stopped on Holden Street in Walnut Terrace at about 9:30 p.m. O'Shields blocked the front of the automobile; Lassiter blocked it from behind. The passenger in the back seat, later identified as Clainey McKinney, was apprehended by O'Shields after trying to flee after the car was stopped. As the officers approached his car, defendant stepped out from the driver's seat and upon request produced his driver's license. Officer Lassiter explained why he had been stopped and advised him of his constitutional rights. While defendant was being questioned, Officer Mitchell approached the automobile and made a visual search from outside the automobile by shining his flashlight into the interior. Mitchell observed what appeared to be the butt of a rifle or shotgun which was partially wrapped in a coat and lying on the back seat of the car. There was also two five-dollar bills lying on the floorboard beneath the steering wheel. Mitchell informed Lassiter of what he

had observed in the car and Lassiter placed defendant under arrest.

Prior to stopping defendant's car, the Raleigh police officers assisting the sheriff's department had been given a description of the vehicle and were informed by the police dispatcher that the three occupants were suspects in an armed robbery. The officers were also informed that the suspects were possibly armed with a shotgun or rifle and that they were to follow and stop the vehicle. The officers were also apparently aware that defendant was owner of the vehicle and that one of the passengers was possibly Clainey McKinney, who was at that time wanted under an arrest warrant for forgery.

After the arrest, Deputy Andy Young went to Walnut Terrace where he recieved the 30-30 rifle seized by Officer Mitchell. Deputy Young then took defendant to the sheriff's office where a search of the defendant's person revealed that defendant had $81.84 in cash consisting of two ten-dollar bills, eight five-dollar bills, eleven one-dollar bills, six quarters, two dimes, two nickels, and four pennies.

On the same evening, Deputy Joe Gerald was in the vicinity of Willow Springs looking for the Oldsmobile involved in the robbery. It was spotted at Hood's Service Station where Willie Jones was adding oil to the engine. Gerald looked into the back seat of the car and saw a heavy imprint left on the cushion along with loose change and dirt on the seat. After the deputy questioned Willie Jones briefly, Jones fled and was not apprehended until later the next day. At 11:30 p.m. Clainey McKinney led Deputy Council to the county landfill, where he recovered the stolen cash register.

At trial W. E. Hinsley from the City/County Bureau of Identification testified that a certain file dated 6 May 1975 contained a complete set of prints of defendant. Phillip D. Robbins from the Bureau of Identification testified that he had taken palm prints from the cash register and that these prints matched those of defendant which were on file with the Bureau. The fingerprint file was not passed to the jury.

From denial of the several motions to suppress evidence, a motion for nonsuit, a motion to set aside the verdict and to grant

a new trial, and entry of judgment sentencing defendant to 25 years in the State's prison, defendant appeals.

*Attorney General Edmisten, by Assistant Attorney General Archie W. Anders, for the State.*

*Davis, Hassell, Hudson, & Broadwell, by Charles R. Hassell, Jr., for defendant appellant.*

MORRIS, Chief Judge.

The defendant has brought forward on appeal numerous exceptions and assignments of error. We note initially that defendant has failed to comply strictly with the requirements of Appellate Rule 28(b)(3) by not properly setting forth a reference to the exceptions and assignments of error following each question presented in the argument portion of his brief. Nevertheless, because such references were properly made under the "Issues Presented" portion of the brief, and the appellant has otherwise conformed with the rules of appellate procedure, we will consider the arguments. The assignments of error will be addressed in the order they appear in defendant's brief.

[1]   Defendant first assigns as error the trial court's denial of his motions to (1) dismiss the charges (G.S. 15A-954), (2) modify conditions for his release pending trial (G.S. 15A-538) "to allow his release on his written promise to appear", and (3) motion for discovery (G.S. 15A-901 *et seq.*) seeking, among other things, "[a] full written description of the so-called 'career criminal' program . . . including the criteria utilized by the District Attorney and the procedure to be followed in the prosecution of [the] case." Defendant argues that the district attorney was without authority to initiate the "career criminal" program and that by singling out the defendant to be given swift prosecution, his opposition to "reasonable" bail, refusal to plea bargain, and his opposition to discovery of the "career criminal" criteria amounted to a denial of due process and equal protection under the United States and North Carolina Constitutions. For the reasons explained *infra*, we reject defendant's arguments.

Defendant asserts that the district attorney's program was essentially a non-legislative enactment of a criminal recidivist law. However, there is a fundamental distinction between the Wake County district attorney's policy for the prosecution of

"career criminals" and prosecution under criminal recidivist statutes. Under the former, the district attorney is implementing a policy of vigorous prosecution using such means as concentrating available manpower on career criminal trials, pursuing tough plea bargaining policies, advocating more restricted pretrial release, and arguing for more severe punishments. These actions are well within the broad prosecutoral discretion long recognized by the courts in this State and require no legislative enactments. *See State v. Furmage,* 250 N.C. 616, 109 S.E. 2d 563 (1959). The exercise of this discretion is beyond constitutional reproach so long as the prosecutoral decisions and policies are not based upon impermissible motives such as bad faith, race, religion, or a desire to prevent the exercise of a constitutionally guaranteed right. *See United States v. Smith,* 523 F. 2d 771 (5th Cir. 1975); *United States v. Berrios,* 501 F. 2d 1207 (2d Cir. 1974). Moreover, even conscious selectivity in the exercise of the prosecutor's discretion, such as a deliberate decision not to implement a specific policy in certain cases, is valid absent an unconstitutional standard or arbitrary classification. *See Oyler v. Boles,* 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed. 2d 446 (1962); *Spillman v. United States,* 413 F. 2d 527 (9th Cir. 1969). Defendant has come forward with no evidence whatsoever that impermissible standards have been used. Defendant's substantive due process and equal protection attacks have no basis whatsoever in the record.

The recidivist statutes, to which defendant has equated the career criminal program, provide by law for more severe penalties upon the conviction of a person falling within the applicable statutory criteria. Application of such recidivist statutes, because they directly affect the defendant's liberty interests, triggers traditional procedural due process rights of reasonable notice and a right to be heard, *Oyler v. Boles, supra.* Similarly, the proceedings established to determine which defendants fall within the statutory criteria are critical stages of the legal process at which a defendant is entitled to legal representation. *Chewning v. Cunningham,* 368 U.S. 443, 82 S.Ct. 498, 7 L.Ed. 2d 442 (1961). However, such procedural due process rights do not arise upon the implementation of the district attorney's program. The defendant's procedural and substantive rights guaranteed by law are not altered by the policy.

Furthermore, the prosecution was not required to provide defendant with "a full written description of the so-called 'career criminal'" program under G.S. 15A-903(d). These documents are not "material to the preparation of the defense", "intended for use by the State as evidence", or "obtained from . . . the defendant". Defendant was informed by letter from the prosecution as to why he was being prosecuted as a "career criminal". Such information was voluntarily provided as a matter of professional courtesy and cooperation. G.S. 15A-903 does not entitle defendant to information on the internal policies of the district attorney's office. *See* G.S. 15A-904.

[2]   Defendant next argues that the court erred in denying his motion to suppress evidence and erred in admitting evidence seized incident to the warrantless arrest of defendant. Defendant contends there was no probable cause for the arrest and that any evidence subsequently obtained as a result of the illegal arrest was inadmissible.

G.S. 15A-401(b)(2) provides that an arrest may be made without a warrant if the officer has probable cause to believe the person to be arrested has committed a felony. There is probable cause for arrest "if the facts and circumstances known to the arresting officer warrant a prudent man in believing that a felony has been committed and the person to be arrested is the felon." *State v. Shore,* 285 N.C. 328, 335, 204 S.E. 2d 682, 686 (1974). Furthermore, it is permissible for police officers to make, in the course of a routine investigation, a brief detention of citizens upon a reasonable suspicion that criminal activity has taken place. *State v. Allen,* 282 N.C. 503, 194 S.E. 2d 9 (1973). Moreover, when incriminating evidence comes to the officer's attention during detention, such evidence may establish a reasonable basis for finding the probable cause necessary for effecting a warrantless arrest. *United States v. Harflinger,* 436 F. 2d 928 (8th Cir. 1970); *State v. Allen, supra.*

The evidence indicates that the initial detention of defendant and his vehicle was justified. The officers had received an accurate description of the suspect's vehicle through the police dispatcher and were informed that its three occupants were suspects in a recently perpetrated crime. *See generally Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925);

*State v. Jones,* 295 N.C. 345, 245 S.E. 2d 711 (1978); *State v. Cobb,* 295 N.C. 1, 243 S.E. 2d 759 (1978); *State v. Legette,* 292 N.C. 44, 231 S.E. 2d 896 (1977); *State v. Phifer,* 290 N.C. 203, 225 S.E. 2d 786 (1976). Even assuming, *arguendo,* the absence of probable cause to make an immediate arrest of the suspects, the flight of Clainey McKinney and the discovery of what appeared to be the robbery weapon in the plain view of the officers was sufficient to ripen the suspicion of the officers into probable cause to make an arrest. The evidence discovered in a search of the car and the person of the defendant incident to the arrest was admissible. *See State v. Jones, supra; State v. Shedd,* 274 N.C. 95, 161 S.E. 2d 477 (1968); *State v. Johnson,* 29 N.C. App. 534, 225 S.E. 2d 113 (1976).

[3] Defendant next assigns as error misstatements of the law by the trial court in its charge to the jury. The first misstatement occurred in the trial court's initial comments to the jury prior to the taking of evidence. In describing the State's burden of proof on the charge of robbery with a firearm, the court declared that the State must prove beyond a reasonable doubt that "the defendant took and carried away a cash register and money, the property of another, *with* the consent of the owner. . . ." Technically the court erred in failing to use the word "without". The instruction appeared in the record in the following context:

> ". . . For you to find the defendant guilty of these offenses, the State must prove by evidence beyond a reasonable doubt that the defendant, F. E. Rudolph took and carried away a firearm, the property of another, without the consent of the owner, knowing that he had not the right to take it and intending at the time to deprive the owner of its use permanently.
>
> For you to find the defendant guilty of robbery with a firearm or other dangerous weapon, the State must prove beyond a reasonable doubt by evidence that the defendant took and carried away a cash register and money, the property of another, with the consent of the owner, knowing that he had not the right to take that property and intending at the time to deprive the owner of its use permanently; . . ."

Considered in that context, we believe the jury could not have been mislead by the trial court's *lapsus linguae.* This misstatement is obvious even to a lay person. Furthermore, it is clear

from the record that in the court's final charge, the jury was instructed properly that the property must have been taken *without* consent of the owner. Considering the context of the initial misstatement, the lapse of time from the misstatement until the jury deliberations, and the correct final charge to the jury, we conclude that defendant could not have been prejudiced by the error. *See State v. Sanders*, 280 N.C. 81, 185 S.E. 2d 158 (1971).

Defendant also asserts that the court's misstatement of the law concerning proof by circumstantial evidence was prejudicial error thus entitling him to a new trial. The court erroneously instructed, ". . . [Y]ou must be satisfied beyond a reasonable doubt that the circumstantial evidence relied upon by the State is *consistent* with his innocence." (Emphasis added.) Not only is it possible that the court reporter erred in transcribing the instruction, it must have been obvious even to jurors without legal training that the court meant to say "inconsistent". Such misstatement, termed *lapsus linguae*, will not be held prejudicial if not called to the attention of the court and if it does not appear that the jury could have been mislead by the statement. *State v. Willis*, 22 N.C. App. 465, 206 S.E. 2d 729 (1974); *see also State v. Gray*, 268 N.C. 69, 150 S.E. 2d 1 (1966), *cert. denied*, 386 U.S. 911, 87 S.Ct. 860, 17 L.Ed. 2d 784 (1967). Defendant's assignments of error relating to errors in the charge are overruled.

[4] Defendant next contends that the trial court erred in permitting testimony concerning conduct of defendant's accomplices in the robbery. He argues that permitting evidence regarding the conduct of his accomplices denies him the right to confront his accusers. He cites as authority *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed. 2d 476 (1968), and *Nelson v. O'Neil*, 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed. 2d 222 (1971). It suffices to say that the cited cases, which apply to confessions of a codefendant, do not support defendant's position. Evidence with respect to the conduct of defendant's accomplices, when relevant to show the operative facts in establishing defendant's criminal conduct, are admissible unless excluded by some other established rule of law.

[5] The admissibility of the State's evidence concerning a palm print found on the stolen cash register has been challenged by defendant. He asserts that this evidence should have been exclud-

ed on the authority of *State v. Irick*, 291 N.C. 480, 231 S.E. 2d 833 (1977). However, that decision does not establish a rule of evidence. As Justice Copeland carefully explained:

". . . The only limitation this Court has imposed on the admissibility of fingerprint comparisons to prove the identity of the perpetrator of a crime is a requirement that the testimony be given by an expert in fingerprint identification. *State v. Tew*, 234 N.C. 612, 68 S.E. 2d 291 (1951); *State v. Helms*, 218 N.C. 592, 12 S.E. 2d 243 (1940); *State v. Huffman*, 209 N.C. 10, 182 S.E. 705 (1935); *State v. Combs*, 200 N.C. 671, 158 S.E. 252 (1931). We have repeatedly said that the testimony of a fingerprint expert is 'competent as evidence tending to show that defendant was present when the crime was committed and that he at least participated in its commission.' *State v. Tew, supra* at 617, 68 S.E. 2d at 295; *accord, State v. Helms, supra; State v. Huffman, supra; State v. Combs, supra.*

The probative force, not the admissibility, of a correspondence of fingerprints found at the crime scene with those of the accused, depends on whether the fingerprints could have been impressed only at the time the crime was perpetrated. *See State v. Miller, supra; State v. Minton*, 228 N.C. 518, 46 S.E. 2d 296 (1948); *State v. Combs, supra.* Ordinarily, the question of whether the fingerprints could have been impressed only at the time the crime was committed is a question of fact for the jury. *State v. Miller, supra; State v. Helms, supra; see State v. Combs, supra.* It is not a question of law to be determined by the court prior to the admission of fingerprint evidence." 291 N.C. at 488-489, 231 S.E. 2d at 839-840.

The rule on a motion for nonsuit is that "[f]ingerprint evidence, standing alone, is sufficient to withstand a motion for nonsuit only if there is '*substantial* evidence of circumstances from which the jury can find that the fingerprints could only have been impressed at the time the crime was committed.' (Citations omitted.)" 291 N.C. at 491-492, 231 S.E. 2d at 841. Nevertheless, there is circumstantial evidence other than the fingerprints tying defendant to the crime. Such other factors along with evidence of the fingerprints is sufficient to withstand the motion for nonsuit.

[6]  Finally, defendant argues that the testimony of the Bureau of Identification representative which referred to a fingerprint file on the defendant was inadmissible as an attempt to circumvent the well-established rule that in a prosecution for a particular crime, the State generally may not present evidence of other distinct, independent, or separate offenses when defendant has not testified. *See* 1 Stansbury's N. C. Evidence § 91 (Brandis Rev. 1973). In *State v. Jackson*, 284 N.C. 321, 200 S.E. 2d 626 (1973), our Supreme Court addressed a similar problem when the fingerprint identification card was given to the jury. The Court was there concerned with possible references in the fingerprint file to prior charges against the defendant. The Court found no error in allowing the jury to see such records when reference to other specific crimes had been effectively deleted. In the case at bar the file was not passed to the jury, and no prior charges appearing on the file were communicated to the jury. Any inference arising from this testimony that defendant had a prior police record was not of sufficient force prejudicially to influence the jury in its deliberations. *Id.; see also State v. McNeil*, 28 N.C. App. 347, 220 S.E. 2d 869 (1976). Testimony referring to the fingerprint identification card was properly admitted.

No error.

Judges WEBB and MARTIN (Harry C.) concur.