STATE OF NORTH CAROLINA v. ERIC FUTRELL, Defendant

No. 9210SC286

(Filed 7 December 1993)

1. **Evidence and Witnesses § 1874 (NCI4th) — rape — fingerprints on window screen — time of impression — no evidence that time of crime exclusive — admissible**

The trial court did not err in a prosecution for second-degree rape and assault on a female by admitting evidence that a crime scene specialist processed a window screen at the scene of the crime and found three latent prints and that these were compared with those of defendant by a fingerprint identification expert who determined that two matched. Although defendant contended that the State failed to present substantial evidence of circumstances from which a jury could find that defendant's fingerprints were impressed on the window screen at the time the crime was committed, whether fingerprints could have been impressed only at the time of a particular crime is ordinarily a question of fact to be determined by the jury, not a question of law to be determined by the court prior to admission of the fingerprint evidence. When a properly qualified fingerprint expert offers evidence that prints found at a crime scene are those of the individual charged with the offense, the expert's testimony is relevant to show the accused was present at the scene on some occasion.

**Am Jur 2d, Evidence § 375.**

2. **Evidence and Witnesses § 2211 (NCI4th)— rape—DNA analysis—matching sample—conflicting expert testimony— State's evidence admissible**

   The trial court did not err in a prosecution for second-degree rape and assault on a female by admitting evidence of DNA profile testing. While the expert testimony presented at defendant's trial was conflicting in that defendant offered evidence to impeach the particular procedures used in a specific test and the reliability of the results obtained, the resultant crucial issue was one of credibility of the experts and it was for the jury to determine what weight each expert's testimony should have received. The trial court properly instructed the members of the jury that they were the sole judges of the credibility of each witness and of the weight to be given the testimony of each witness, that they might believe all or any part or none of the testimony of each witness, and that they were not to accept an expert witness's opinion to the exclusion of the facts and circumstances disclosed by other testimony.

   **Am Jur 2d, Expert and Opinion Evidence § 300.**

3. **Appeal and Error § 147 (NCI4th)— rape—DNA testing—issue not preserved for appeal**

   A defendant could not assign as error the introduction of DNA evidence in a rape trial where, upon motions by defendant *in limine* for a pretrial hearing on DNA evidence and to suppress DNA evidence, the court conducted a *voir dire* hearing at which only Dr. Adams of the F.B.I. testified, defendant offered no evidence at the hearing and specifically no testimony from either of his expert witnesses, and, in arguing the motions, defendant's trial counsel advised he had decided to "reserve . . . to the jury" the issue of reliability of the F.B.I.'s DNA testing while asserting that the evidence was inadmissible upon other grounds. Moreover, there is a presumption that the court's evidentiary rulings are proper; defendant bears the burden of demonstrating that a particular ruling was incorrect and failed to meet this burden.

   **Am Jur 2d, Appeal and Error §§ 545 et seq.**

4. **Evidence and Witnesses § 650 (NCI4th) — rape — DNA testing — motion to suppress denied — findings not made — not required**

Findings of fact were not required to support the trial court's denial of defendant's motions to suppress DNA evidence in a rape trial where defendant presented no evidence at the *voir dire* hearing and the testimony of the State's witness did not support defendant's contention regarding the unreliability of F.B.I. methodology. Where evidence is uncontroverted and the facts not in dispute, a trial court is not *required* to make findings of fact, even when provided for by statute or case law. Additionally, the court indicated to counsel at the end of the trial that he would cooperate if there were matters needing attention at a later date, leaving his home telephone number with the court clerk, so that defendant's counsel had an opportunity to reiterate his request for findings. Finally, defendant prepared the record for appeal and could have sought to have the findings included therein.

**Am Jur 2d, Motions, Orders and Rules § 26.**

5. **Constitutional Law § 349 (NCI4th); Evidence and Witnesses § 2170 (NCI4th) — rape — DNA testing — results not presented by technician performing tests — admissible**

A rape and assault defendant's Sixth Amendment right to confront witnesses against him was not violated by the admission into evidence of DNA profile test results where the lab technician who actually performed the tests did not testify at trial. The expert witness who presented the results supervised the testing procedure upon which his opinions were based, was present for cross-examination and was questioned vigorously and thoroughly, the record reflects that the technician's notes and photographs were available to defendant's counsel, and defendant at no time attempted to subpoena the laboratory technician nor sought the assistance of the court in securing her presence for trial. An expert need not base his opinion upon personal knowledge as long as the basis for his or her opinion is available in the record or available upon demand. N.C.G.S. § 8C-1, Rule 703.

**Am Jur 2d, Expert and Opinion Evidence §§ 75 et seq.**

**6. Rape and Allied Sexual Offenses § 98 (NCI4th) — second-degree rape and assault on a female — sufficiency of evidence**

The trial court did not err by denying defendant's motion to dismiss charges of second-degree rape and assault on a female based on insufficient evidence where the State's DNA evidence was admissible; while defendant claims the State failed to make a showing that his fingerprints could only have been impressed on the victim's window frame at the time of the offense, defendant's argument is misplaced because the fingerprint evidence at defendant's trial did not stand alone, nor was it necessarily the primary component of the State's case; and the victim's admitted inability to detail her assailant's physical characteristics with accuracy or certainty is a circumstance for the jury to consider when evaluating her testimony. Moreover, defendant introduced evidence after making the motion to dismiss and did not make a motion to dismiss at the true close of all the evidence. N.C.R. App. P. 10(b)(3).

**Am Jur 2d, Rape §§ 88 et seq.**

**7. Criminal Law § 1158 (NCI4th) — rape — sentencing — aggravating factors — use of deadly weapon — armed with deadly weapon — improper**

The trial court erred when sentencing defendant for second-degree rape by finding in aggravation that defendant was armed with a deadly weapon at the time of the crime and that defendant used a deadly weapon where both findings were supported by evidence that defendant possessed a knife at the victim's apartment. Defendant's use of a deadly weapon presupposes he was armed with it and the court erroneously used the same evidence to prove two distinct factors.

**Am Jur 2d, Criminal Law §§ 598, 599.**

Appeal by defendant from judgment entered 22 November 1991 by Judge Knox V. Jenkins, Jr. in Wake County Superior Court. Heard in the Court of Appeals 31 March 1993.

*Attorney General Lacy H. Thornburg, by Assistant Attorney General Valerie B. Spalding, for the State.*

*John T. Hall for defendant-appellant.*

STATE v. FUTRELL

[112 N.C. App. 651 (1993)]

JOHN, Judge.

Defendant appeals his conviction and sentence on one count of second degree rape and one count of assault on a female. He asserts the trial court erred by: 1) admitting certain fingerprint and DNA evidence; 2) denying his motion to dismiss at the close of all the evidence; and 3) finding duplicitous aggravating factors. We agree in part and remand the charge of second degree rape for resentencing.

At trial, the State's evidence included the following: During the early morning hours of 16 June 1989, Elizabeth D. (the victim), a nineteen year old student sharing an apartment with two female roommates, was awakened by a kiss on her cheek from a male she did not recognize. She felt what she believed to be a knife at her neck, and was told: "[s]hut up, face the wall or I'll kill you." When she turned away from the assailant, he inserted his finger into her vagina and told her to take off her underwear, repeatedly threatening to kill her if she fought with him or failed to comply. After she removed her underwear, the man forced himself between her legs and, still holding the knife in his left hand, had intercourse with her against her will. To stifle her cries, the victim held blankets and a stuffed animal to her face. She estimated the encounter lasted five to ten minutes. Afterwards, the assailant asked if she had any money, but left without taking the $2.00 she offered. The victim looked at her bedside digital clock, which indicated it was 5:43 a.m. She awakened her roommates, telephoned her father, and thereafter contacted the police. An officer drove the victim to the hospital, where a rape kit procedure was performed and a blood sample taken.

A crime scene specialist processed for fingerprints the living room window of the victim's apartment as well as a screen which had been removed, the window having been determined to be the attacker's point of entry. No fingerprints were found on the window glass, but three latent fingerprints were discovered on the screen. Defendant was later fingerprinted, and, upon inquiry at that time, responded there was no reason his fingerprints should be anywhere in or around the victim's apartment. An expert in fingerprint identification, after comparing the latent fingerprints found on the screen with those of defendant, determined two matched.

Several witnesses placed defendant in close proximity to the victim's apartment at or about the time of the assault.

An expert in forensic serology testified blood samples revealed the victim and defendant each were "ABO Type A secretors" in blood classification. A slide of a stain taken from the victim's panties indicated the presence of spermatozoa.

Special Agent Dwight Adams, Ph.D. (Dr. Adams), assigned to the DNA Analysis Unit of the F.B.I. Laboratory in Washington, D.C., testified as an expert in forensic DNA analysis. He explained in detail the F.B.I. procedure in testing and analyzing DNA samples, as well as quality controls in place at the F.B.I. Laboratory. Using vaginal swabs from the victim, a cutting from her panties, and blood samples from both the victim and defendant, he examined four "autorads," each representing a different genetic locus. In all four, he concluded DNA from semen found on the victim's panties matched DNA from defendant's blood sample. Therefore, defendant could not be eliminated as a possible source of the semen. Dr. Adams then compared DNA from defendant's blood sample and the semen to the F.B.I.'s black population data base and concluded the probability of finding a random match of the DNA in the semen and in defendant's blood was approximately 1 in 2.7 million individuals.

Pertinent portions of defendant's evidence indicated the following: Dr. Moses Schanfield (Dr. Schanfield), an expert in DNA analysis, was critical of the F.B.I. statistical methodology, stating it was hard to derive and justify mathematically. According to Dr. Schanfield, weaknesses in the F.B.I. procedure lead to distortions in results, particularly because of the small size and unknown details of the data base it utilizes. He also explained the principle of Hardy-Weinberg equilibrium and the use of the product rule in calculating the probability of a coincidental match in DNA material.

On cross-examination, Dr. Schanfield acknowledged he recalculated the frequency statistics on the matches demonstrated by the four F.B.I. "autorads," ultimately determining nothing excluded defendant as a possible donor of the semen found on the victim's underwear. However, his calculation determined the chance of finding another black male in the population with the same four profiles to be 1 in 237,000.

Dr. Ted Emigh (Dr. Emigh), associate faculty member in the Department of Genetics at North Carolina State University, testified as an expert in statistics and population genetics on defendant's behalf. Based on the statistical theory involved in quantifying the

product rule used by the F.B.I. once its laboratory has declared a "match" of DNA fragments, the data base used by the F.B.I. in defendant's case was not, in Dr. Emigh's opinion, random but rather "haphazard" because the sample size was too small. To calculate accurate probability when an individual is from a particular location, he stated, it is necessary to collect blood samples representative of that community for the data base—as opposed to samples from the "whole population." With a 300-person data base, for example, he contended it was impermissible to use the product rule in statistical calculations, and that a sample size of several thousand would be needed for valid computations. He further alleged the F.B.I. had neither demonstrated the lack of substructuring nor satisfactorily and scientifically established the existence of Hardy-Weinberg equilibrium in their data base.

Defendant testified on his own behalf and, in detailing his activities on the morning in question, denied raping the victim and stated he did not touch the living room window or its screen on 16 June 1989. Through his testimony and that of other witnesses, defendant presented evidence tending to show alibi and an earlier occasion on which he might have handled the window screen.

In rebuttal by the prosecution, Dr. Bruce Weir (Dr. Weir), professor of statistics and genetics at North Carolina State University, testified as an expert in statistics and population genetics. Having previously done consulting work with the F.B.I. and with access to its data base, he estimated the frequency of defendant's DNA profile in the U.S. black population to be 1 in 2.8 million. While acknowledging the F.B.I. data base is small, Dr. Weir explained he included in his calculation a statistical mechanism to accommodate that fact. He stated the method by which the F.B.I. gathered and applied its data base to defendant's case "is certainly accepted by the people who have had opportunity to examine the data."

I.

[1] Defendant first contends the trial court erred by denying his motion to suppress and overruling his objections to fingerprint evidence. He argues the State failed to present substantial evidence of circumstances from which a jury could find defendant's fingerprints were impressed on the window screen *at the time the crime was committed. See State v. Miller*, 289 N.C. 1, 4, 220 S.E.2d 572, 574 (1975) (emphasis added). However, whether fingerprints

could have been impressed *only* at the time of a particular crime is ordinarily a question of fact to be determined by the jury, "not a question of law to be determined by the court prior to admission of the fingerprint evidence." *State v. Bost*, 33 N.C. App. 673, 677, 236 S.E.2d 296, 298, *disc. review denied*, 293 N.C. 254, 237 S.E.2d 537 (1977). As our Supreme Court stated in *State v. Irick*:

> The only limitation this Court has imposed on the admissibility of fingerprint comparisons to prove the identity of the perpetrator of a crime is a requirement that the testimony be given by an expert in fingerprint identification. We have repeatedly said that the testimony of a fingerprint expert is "competent as evidence tending to show that defendant was present when the crime was committed and that he at least participated in its commission."
>
> The probative force, not the admissibility, of a correspondence of fingerprints found at the crime scene with those of the accused, depends on whether the fingerprints could have been impressed only at the time the crime was perpetrated. Ordinarily, the question of whether the fingerprints could have been impressed only at the time the crime was committed is a question of fact for the jury. It is not a question of law to be determined by the court prior to the admission of fingerprint evidence.

*State v. Irick*, 291 N.C. 480, 488-89, 231 S.E.2d 833, 839-40 (1977) (citations omitted) (quoting *State v. Tew*, 234 N.C. 612, 617, 68 S.E.2d 291, 295 (1951)).

Therefore, when a properly qualified fingerprint expert offers evidence prints found at a crime scene are those of the individual charged with the offense, the expert's testimony is relevant to show the accused was present at the scene on some occasion. *Bost*, 33 N.C. App. at 676, 236 S.E.2d at 298. However, the probative value of such evidence upon the question of the accused's guilt "depends upon the strength of evidence of circumstances from which the jury might find that the fingerprints could have been impressed only at the time the crime was committed." *Id*. The question of the "substantiality" of the fingerprint evidence may be considered later by the court in ruling on a motion to dismiss based upon insufficiency of the evidence. *See, e.g., Irick*, 291 N.C. at 491-92, 231 S.E.2d at 841 (quoting *State v. Miller*, 289 N.C. 1, 4, 220 S.E.2d 572, 574 (1975)) ("Fingerprint evidence, standing alone, is sufficient

to withstand a motion for nonsuit only if there is '*substantial* evidence of circumstances from which the jury can find that the fingerprints could only have been impressed at the time the crime was committed.' "); *see also* discussion *infra* part III.

Examining the record in view of the foregoing principles, we observe the crime scene expert testified he processed the window screen and found three latent prints. These were compared with those of defendant by the fingerprint identification expert who determined two matched. There was no error by the trial court in permitting the fingerprint evidence, and this assignment of error is without merit.

## II.

[2]  Defendant next maintains the trial court erred by admitting evidence of DNA profile testing. Specifically, defendant contends the DNA evidence should have been excluded because (A) the methodology used by the F.B.I. in determining a statistical compilation of the frequency of a matching DNA "print" was insufficiently reliable for the results derived therefrom to be admissible, and (B) defendant was denied his constitutional rights to effective confrontation of witnesses by inability to cross-examine the individual who actually conducted and directly observed the F.B.I.'s DNA testing. For the reasons which follow, we are not persuaded by defendant's arguments.

## A.

Preliminarily, it is necessary briefly to review the process of DNA analysis. In simplistic terms, long double-stranded molecules called DNA are found in the chromosomes carried within the nuclei of all cells; DNA molecules contain each individual's genetic code and carry his or her hereditary patterns. The methodology of DNA testing is complex and the terminology difficult. *See generally Springfield v. State*, 860 P.2d 435 (Wyo. 1993); Jonathan J. Koehler, *DNA Matches and Statistics: important questions, surprising answers*, 76 Judicature 222, 222-29 (1993). However, the analytical procedure or "protocol" at issue in the case *sub judice* (known as restriction fragment length polymorphism or "RFLP") essentially involves taking DNA samples from blood or semen found on a victim or at the crime scene and comparing the DNA in those samples with DNA taken from the nuclei of a suspected perpetrator's blood cells.

First, the "known" and "unknown" samples of DNA molecules are chemically cut into fragments, separated into single strands, and lined up longest to shortest. A "probing step" follows to isolate those portions of DNA molecules which are "variable," that is, differ from one individual to another. Four specific areas of the DNA molecule are usually "probed" in the RFLP procedure. Then a process called autoradiography yields an exposed film called an "autorad" showing a pattern of fuzzy lines or bands, commonly referred to as a "DNA profile."

Bands derived from the known and unknown samples are thereafter compared visually. If the numbers and positions of the bands on the autorad appear consistent with one another (i.e. — "line up"), they are then sized by computerized measurement with reference to "size markers" or "sizing ladders" which also appear on autorads in three parallel lanes. After visual examination and computerized measurement, an "interpretation" is made as to whether, within a specified deviation or "match window," a "match" may be declared. Under the F.B.I. protocol, a margin of error of plus or minus 2.5% is permitted.

Finally, the statistical significance of the "match," that is, the probability of finding identical strands of DNA in someone other than the accused, is determined. This is accomplished by ascertaining the frequency with which a particular pattern of bands will appear within a relevant population, this latter being initially established by the race of the individual involved and by references to the pertinent data base compiled by the testing agency. Defendant strenuously argues the F.B.I.'s procedures involved in this final step of statistical interpretation were not "sufficiently reliable." As a consequence, defendant insists, he was "unfairly prejudiced" by admission into evidence of the resulting calculations. Moreover, by his contention "[t]he mere fact of a match [between DNA from defendant and from the semen found on the victim's panties] is without meaning unless you also know the rarity of the matching pattern[,]" defendant implies evidence of the match was irrelevant.

By thus asserting lack of relevance and prejudice, defendant tracks language from the decision of our Supreme Court in State v. Pennington, 327 N.C. 89, 393 S.E.2d 847 (1990). In ruling evidence of DNA profile testing "generally admissible," id. at 101, 393 S.E.2d at 854, the court focused on several "indices of reliability," such as "the expert's use of established techniques, the expert's profes-

sional background in the field, the use of visual aids before the jury . . . and independent research conducted by the expert." *Id.* at 98, 393 S.E.2d at 853. However, the court stated DNA test results should not *always* be admitted into evidence:

> The admissibility of any such evidence remains subject to attack. Issues pertaining to *relevancy or prejudice* may be raised. For example, expert testimony may be presented to impeach the particular procedures used in a specific test or the reliability of the results obtained. In addition, traditional challenges to the admissibility of evidence such as the contamination of the sample or chain of custody questions may be presented. These issues relate to the weight of the evidence. The evidence may be found to be so tainted that it is totally unreliable and, therefore, must be excluded.

*Id.* at 101, 393 S.E.2d at 854 (emphasis added) (citation omitted) (quoting *State v. Ford*, 301 S.C. 485, 490, 392 S.E.2d 781, 784 (1990)).

This Court has recently amplified the above-quoted language from *Pennington*:

> [W]here unfair prejudice is not clear and where there is merely conflicting expert testimony regarding interpretation of the DNA evidence or where two experts have reached differing results based on independent analyses of the DNA, the issue becomes one of credibility of the experts. In that situation the jury is obligated to determine what weight each expert's testimony should receive.

*State v. Bruno*, 108 N.C. App. 401, 409-410, 424 S.E.2d 440, 445, *disc. review denied, appeal dismissed*, 333 N.C. 464, 428 S.E.2d 185 (1993).

To support his contention of prejudice, defendant, relying primarily on expert testimony given below, outlines in his brief the three-step process followed by the F.B.I. in determining the frequency of occurrence of DNA prints matching his own:

> First, the lab must have reliable information about the frequency of each allele (band) on the autorad (prints). This is done by looking at a data base consisting of the DNA prints of a number of individuals and determining the percentage of bands that fall within the same "bin" as the band in question. For example, if three percent of the bands in the database fall

within the same bin as the band in question, the band is assigned a frequency of .03 or 3 percent.

The second part is to determine the frequency of genotypes. A genotype is the pair of bands produced by a given probe. One band is inherited from the mother and one from the father. To determine the frequency of heterozygous (two band) genotypes, the F.B.I. uses the formula $2pq$ where $p$ and $q$ are the frequencies of the two alleles (bands) in the genotype. If the frequency of band A is .03 and the frequency of band B is .05, the F.B.I. lab multiplies .03 $\times$ .05 $\times$ 2. This makes the genotype AB frequency .003 (3 in 1000).

The final step is to determine the frequency of the entire DNA print (all bands in combination). The product rule is used. The product rule specifies the joint probability of several events in cases where the events are statistically independent. If four probes were used, step two would have produced four genotype frequencies. These frequencies are then multiplied together to obtain the frequency of the entire DNA print.

Defendant then argues the foregoing procedure assumes bands in DNA "prints" comprising the F.B.I. data base are statistically independent of each other and that each provides independent information. He disputes the validity of these assumptions because:

[T]here are only limited samples, a limited database, from which the F.B.I. can estimate the population frequencies of the various DNA sequences.

The database used by the F.B.I. for a black population in the present case consisted of only 500 individuals. The F.B.I.'s assumptions fail to take into consideration population substructure or that traits have different frequencies in different population subgroups. In fact, the F.B.I. has no way of knowing *anything* about what the subgroups are or even if all contributors to their black population database are black persons, genetically speaking.

Such a subgroup would be a community of "black persons who live in a relatively isolated, rural community. There may be an extraordinary degree or [sic] intermarriage or inbreeding within these subpopulations. If mating is not random, the subpopulation may not be in so-called Hardy-Weinberg equilibrium, and the frequencies within the subpopulation may deviate from

the frequencies obtaining in the broader group." (Quoting Giannelli & Imwinkelreid, *Scientific Evidence* 129 (1991 Supp.) ).

The Hardy-Weinberg equilibrium is a principle used in population genetics that asserts that so long as certain criteria are met, the frequencies of the alleles (bands, genes) are going to remain constant from generation to generation.

In sum, defendant contends the F.B.I.'s data base is too small to permit use of the product rule and fails to take population substructure into consideration. Additionally, defendant suggests the record in this case is without evidence of specific testing performed by or for the F.B.I., or the results therefrom, to determine if its black population data base is in Hardy-Weinberg equilibrium.

At defendant's trial, the State's witnesses Dr. Adams and Dr. Weir, and defendant's witnesses Dr. Schanfield and Dr. Emigh, were declared experts in their respective fields. Each explained various aspects of the DNA testing process and how they reached their individual opinions. Furthermore, the experts used visual aids to assist the jury, "so that the jury [was] not asked 'to sacrifice its independence by accepting [the] scientific hypotheses on faith.'" *Pennington*, 327 N.C. at 98, 393 S.E.2d at 853 (second alteration in original) (quoting *State v. Bullard*, 312 N.C. 129, 151, 322 S.E.2d 370, 382 (1984) ).

Contrary to defendant's evidence and his assertions regarding the inherent unreliability of the F.B.I.'s statistical DNA methodology, is evidence from Dr. Weir. Testifying as an expert in statistics and population genetics, he explained a statistical mechanism is employed to accommodate the F.B.I. data base size restriction, and that population substructure concerns ("defendant's ethnic background, where he lived") are irrelevant since the F.B.I.'s frequency calculations are done under the assumption the particular defendant did *not* donate the DNA material in question. In addition, he testified the product rule is appropriate for the data base of black individuals maintained by the F.B.I. When asked if "[t]he method by which the F.B.I. gathered their data base and applied the data base to this case" is "generally accepted in the population genetics community," Dr. Weir responded, "[i]t is certainly accepted by the people who have had opportunity to examine the data." Also, Dr. Weir's own calculations were made using the F.B.I.'s data bases. Finally, the record affirmatively reflects testimony by Dr. Adams that two individuals, including Dr. Weir, have examined

the F.B.I.'s data base and have "shown that [the] data are in Hardy-Weinberg equilibrium for the different probes" used by the F.B.I.

While the expert testimony presented at defendant's trial was "conflicting," *Bruno*, 108 N.C. App. at 410, 424 S.E.2d at 445, in that defendant offered evidence "to impeach the particular procedures used in a specific test [and] the reliability of the results obtained," *Pennington*, 327 N.C. at 101, 393 S.E.2d at 854 (citation omitted), the resultant crucial issue was one of "credibility of the experts" and it was for the jury "to determine what weight each expert's testimony" should have received. *Bruno*, 108 N.C. App. at 410, 424 S.E.2d at 445. Mere "conflicting expert testimony" regarding F.B.I. statistical procedures neither suggests prejudice so "unfair," nor shows those procedures were so "totally unreliable," as to require exclusion from evidence of the resulting compilations. *Id.* at 409-10, 424 S.E.2d at 445. Dr. Adams testified the likelihood of a person's having defendant's DNA profile was 1 in 2.7 million, Dr. Schanfield that it was 1 in 237,000, and Dr. Weir stated the figure as 1 in 2.8 million.

The trial court properly instructed the members of the jury they were the "sole judges" of the credibility of each witness and of the weight to be given the testimony of each witness, that they might "believe all or any part or none" of the testimony of each witness, and that they were not "to accept an expert witness's opinion to the exclusion of the facts and circumstances disclosed by other testimony." It was for the jury, therefore, to determine the credibility and weight to give each opinion, and defendant was not, as he insists, "unfairly prejudiced" by the admission of DNA testing results. *See also State v. Jackson*, 320 N.C. 452, 456, 358 S.E.2d 679, 681 (1987) (approving *sub silentio* expert testimony defendant could not be excluded as child's father, as well as the frequency of defendant's genes in black population, the "likelihood of paternity," and the "paternity index"). Because defendant's contentions of "unfair prejudice" from the admission of statistical probabilities of a "match" in DNA samples are thus unfounded, his derivative argument regarding irrelevance of "match" evidence must also fail.

[3] In considering defendant's assertion of prejudice, we also note the procedural context in which he argues unreliability of the DNA evidence presented by the State. At trial, upon motions by defendant *in limine* for a pretrial hearing on DNA evidence and to sup-

press DNA evidence, the court conducted a *voir dire* hearing at which *only* Dr. Adams of the F.B.I. testified. While defendant filed a brief with the trial court, (not included in the record, *see* N.C.R. App. P. 9(a)(3)(i); 28(a) ), he offered no evidence at the hearing and specifically no testimony from either of his expert witnesses. In arguing the motions, defendant's trial counsel advised he had decided to "reserve . . . to the jury" the issue of reliability of the F.B.I.'s DNA testing, nonetheless asserting the evidence was inadmissible upon other grounds. *See infra* § B. The court thereafter denied defendant's motions.

Having abandoned at trial his argument the F.B.I.'s DNA testing was unreliable, and having failed to put forth expert testimony on the issue at the *voir dire* hearing concerning the admissibility of the evidence, defendant may not now assign as error the trial court's decision to allow the evidence to be presented. "[A] defendant is not prejudiced . . . by error resulting from his own conduct." N.C. Gen. Stat. § 15A-1443(c) (1988). Moreover, there is a presumption the court's evidentiary rulings are proper; defendant bears the burden of demonstrating a particular ruling was in fact incorrect. *State v. Herring*, 322 N.C. 733, 749, 370 S.E.2d 363, 373 (1988). Defendant has failed to meet this burden.

[4] Defendant also complains the trial court, despite his request, failed to make findings of fact in denying the motion to suppress DNA evidence. The court agreed, with counsel's consent, to place appropriate findings in the record at a later time, but apparently failed to do so. However, where evidence is uncontroverted and the facts not in dispute, a trial court is not *required* to make findings of fact, even when provided for by statute or case law. *State v. Phillips*, 300 N.C. 678, 685-86, 268 S.E.2d 452, 457 (1980); *State v. Norman*, 100 N.C. App. 660, 663, 397 S.E.2d 647, 649 (1990), *disc. review denied, appeal dismissed*, 328 N.C. 273, 400 S.E.2d 459 (1991). As defendant presented no evidence at the *voir dire* hearing and Dr. Adams' testimony did not support defendant's contention regarding the unreliability of F.B.I. methodology, there was no factual dispute. Therefore, no findings were required to support the court's denial of defendant's motions. *Phillips*, 300 N.C. at 685, 268 S.E.2d at 457 ("[T]he necessary findings are implied from the admission of the challenged evidence.")

In addition, it bears mention the court at the conclusion of the trial indicated to counsel "[i]f there are matters that need

my attention . . . at a later date, you can rest assured I'll cooperate," advising them the judge's home telephone number would be left with the court clerk. Defendant's counsel thus had an opportunity to reiterate his request for findings. We further note since defendant prepared the proposed record on appeal, he bore the initial responsibility regarding its content, and could have sought to have the findings included therein. *See McLeod v. Faust*, 92 N.C. App. 370, 371, 374 S.E.2d 417, 418 (1988) ("[A]ppellant . . . bears the burden of seeing that the record on appeal is properly settled and filed with this Court."); *see also* N.C.R. App. P. 11(b).

B.

[5] Defendant additionally contends his Sixth Amendment right to confront witnesses against him was violated by admission into evidence of DNA profile test results, since the lab technician who actually performed the tests did not testify at trial. Although Dr. Adams did not personally carry out or oversee each test procedure, he was permitted to present the results to the jury. However, he did supervise and "monitor" the technician who conducted the tests, and she made notes and took photographs at each stage of the technical process for his review.

Regarding the foundation for a testifying expert's opinion, Rule 703 of North Carolina's Evidence Code provides as follows:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

N.C. Gen. Stat. § 8C-1, Rule 703 (1992). An expert need not base his opinion upon personal knowledge "as long as the basis for his or her opinion is available in the record or available upon demand." *Thompson v. Lenoir Transfer Co.*, 72 N.C. App. 348, 350, 324 S.E.2d 619, 620-21 (1985).

Our courts have held admission of expert opinion based on hearsay evidence not in itself admissible does not violate the Sixth Amendment guarantee of an accused's right to confront his accusers so long as the expert is available for cross-examination. *State v. Huffstetler*, 312 N.C. 92, 108, 322 S.E.2d 110, 120-21 (1984) (citing *U.S. v. Williams*, 447 F.2d 1285 (5th Cir. 1971) (*en banc*),

**STATE v. FUTRELL**

[112 N.C. App. 651 (1993)]

*cert. denied*, 405 U.S. 954, 31 L.Ed.2d 231, *reh'g denied*, 405 U.S. 1048, 31 L.Ed.2d 591 (1972) ), *cert. denied*, 471 U.S. 1009, 85 L.Ed.2d 169 (1985); *Cf. U.S. v. Lawson*, 653 F.2d 299, 301 (7th Cir. 1981) (introduction of expert testimony based on hearsay may create constitutional problems if there is no adequate opportunity to cross-examine the expert, and if defendant does not have access to the information relied upon by the witness), *cert. denied*, 454 U.S. 1150, 71 L.Ed.2d 305 (1982).

In the case *sub judice*, Dr. Adams supervised the testing procedure upon which his opinions were based. He was present for cross-examination and was questioned vigorously and thoroughly. In addition, the record reflects the technician's notes and photographs were available to defendant's counsel, and that defendant at no time attempted to subpoena the laboratory technician nor sought the assistance of the court in securing her presence for trial. Indeed, in arguing the DNA test results should be suppressed because of the technician's absence, defendant's counsel conceded, "[y]es, we can subpoena her and get her here. It would be difficult, because she's an out-of-state witness, but we can do that." Thus, defendant's constitutional arguments regarding the testimony of Dr. Adams are unavailing.

Based on sections A. and B. above, therefore, we hold the trial court committed no prejudicial error in denying defendant's motions to exclude evidence of DNA profile testing.

### III.

[6] Defendant next assigns error to the court's denial of his motion, "made at the close of all the evidence," to dismiss the charges against him because of insufficiency of the evidence.

In support of this contention, defendant offers three arguments. First, defendant reiterates his belief that evidence of DNA profiling was insufficiently reliable and should have been excluded. We have rejected this assertion in part II above.

Defendant then once more claims the state failed to make a showing his fingerprints could only have been impressed on the victim's window frame at the time of the offense. As earlier noted, defendant's argument regarding fingerprint evidence is misplaced. "Fingerprint evidence, *standing alone*, is sufficient to withstand a motion [to dismiss] only if there is '*substantial* evidence of circumstances from which the jury can find that the fingerprints

could only have been impressed at the time the crime was committed.' " *Irick*, 291 N.C. at 491-92, 231 S.E.2d at 841 (first emphasis added); *see also State v. Rudolph*, 39 N.C. App. 293, 303, 250 S.E.2d 318, 325, *disc. rev. denied, appeal dismissed*, 297 N.C. 179, 254 S.E.2d 40 (1979). Where the State seeks to prove defendant's guilt *primarily* through the use of fingerprint evidence, moreover, a motion to dismiss "is properly denied if, in addition to testimony by a qualified expert that the fingerprints at the scene of the crime match those of the accused, there is substantial evidence of circumstances from which a jury could find that the fingerprints were impressed at the time the crime was committed." *State v. Bradley*, 65 N.C. App. 359, 362, 309 S.E.2d 510, 512 (1983) (citations omitted).

Suffice it to observe the fingerprint evidence at defendant's trial did not "stand alone," nor was it necessarily the "primary" component of the State's case. Plenary evidence, including fingerprint and DNA evidence as well as placement of defendant near the victim's apartment at the time of the crime by numerous witnesses, linked him with the offenses charged. *See, e.g., State v. Mercer*, 317 N.C. 87, 95-98, 343 S.E.2d 885, 890-92 (1986). There was "substantial evidence . . . to support a finding that the offense[s] charged [second degree rape and assault on a female] [had] been committed and that defendant committed [them]," *State v. McKinney*, 288 N.C. 113, 117, 215 S.E.2d 578, 582 (1975). Although evidence susceptible to an inference defendant's prints might have been left on the screen at an earlier time was introduced, the court is not required to exclude "every reasonable hypothesis of innocence" prior to denying a motion to dismiss. *State v. Powell*, 299 N.C. 95, 101, 261 S.E.2d 114, 118 (1980).

Finally, defendant correctly points out the victim was unable to identify him as her assailant, and descriptions she gave to investigating officers were inconsistent with other evidence of defendant's appearance at the time of the assault. However, "contradictions and discrepancies do not warrant dismissal of the case — they are for the jury to resolve." *State v. Earnhardt*, 307 N.C. 62, 67, 296 S.E.2d 649, 653 (1982). The victim's admitted inability to detail her assailant's physical characteristics with accuracy or certainty is a circumstance for the jury to consider when evaluating her testimony.

We also note again the procedural context in which this particular assignment of error is presented. In his brief, defendant cites to a point in the record where most of the evidence had been presented, where the court and counsel were discussing the court's charge to the jury, and where defendant's counsel indeed made a motion to dismiss which was subsequently denied. However, the defense *thereafter* presented a character witness to testify on defendant's behalf, thereby "reopen[ing] its case." Dr. Weir also testified at some length as a rebuttal witness for the State at this time. The record reflects defendant made *no* motion to dismiss at the true close of *all* the evidence. N.C.R. App. P. 10(b)(3) is controlling herein:

A defendant may make a motion to dismiss the action or judgment as in case of nonsuit at the conclusion of all the evidence, irrespective of whether he made an earlier such motion. . . . However, *if a defendant fails to move to dismiss the action or for judgment as in case of nonsuit at the close of all the evidence, he may not challenge on appeal the sufficiency of the evidence to prove the crime charged.*

(Emphasis added).

Based on the foregoing, we find this assignment of error unpersuasive.

IV.

[7] Finally, we examine defendant's contention the trial court erred to his prejudice by finding "duplicitous" factors in aggravation of his sentence, thereafter sentencing him to thirty years' imprisonment for second degree rape — a term beyond the statutory presumptive sentence of twelve years. *See* N.C. Gen. Stat. §§ 14-27.3 (1986); 14-1.1 (1986); 15A-1340.4(f)(2) (Cum. Supp. 1992). Defendant's argument comports with a recent holding of our Supreme Court, and accordingly we remand the charge of second degree rape for resentencing. *State v. Kyle*, 333 N.C. 687, 430 S.E.2d 412 (1993).

Among the enumerated factors under North Carolina's Fair Sentencing Act (N.C. Gen. Stat. §§ 15A-1340.1-1340.7 (1988 and Cum. Supp. 1992)) which may be used by a trial court to "aggravate" or increase a defendant's sentence beyond the statutory "presumptive" term is the following: "[t]he defendant was armed with or used a deadly weapon at the time of the crime." § 15A-1340.4(a)(1)(i). However, § 15A-1340.4(a) mandates "the same

item of evidence may not be used to prove more than one factor in aggravation." While the sentencing form used by the court in the case *sub judice* was modelled closely after the statute, it varies in minor detail. Pertinently, § 15A-1340(a)(1)(i) is divided on the form into two possible aggravating factors, designated as 9.a. and 9.b. The trial court placed an "X" beside each of these on the sentencing form, indicating it found as aggravating factors both that "defendant was armed with a deadly weapon at the time of the crime," (designated 9.a.) and that "defendant used a deadly weapon at the time of the crime" (9.b.). The court also specifically found two factors in mitigation of defendant's sentence: "defendant has no record of criminal convictions," and "defendant has been a person of good character or has had a good reputation in the community in which he lives."

Defendant argues the trial judge erroneously used "the same item of evidence [i.e.—his possession of a knife] . . . to prove more than one factor in aggravation" of his sentence in violation of § 15A-1340.4(a). He insists in order to *use* a deadly weapon (the aggravating factor set forth in 9.b.), an individual must necessarily also be *armed* with it at the time of the crime (the aggravating factor set forth in 9.a.). Defendant further asserts the notations on the sentencing form reflect the court's perception the same item of evidence supported findings of two separate aggravating factors, and that misconception in turn could have affected the manner in which the court thereafter balanced the factors, resulting in the erroneous and prejudicial determination those in aggravation outweighed those in mitigation.

Defendant's position finds support in *State v. Kyle*:

[T]his statute [§ 1340.4(a)(1)(i)] was intended to encompass two kinds of conduct: (1) the actual use of a deadly weapon in the commission of a crime, and (2) merely having a weapon in one's possession at the time of the crime. The fact that both of these factors in aggravation are listed on the appropriate sentencing form merely affords a sentencing court with a mechanism for aggravating a crime where a defendant merely arms himself with a deadly weapon at the time of the crime but does not actually use it in the commission of the offense. In this case, the evidence shows that defendant used a deadly weapon in the commission of the crimes of burglary and kidnapping. *Defendant could not use a deadly weapon in the commis-*

*sion of the offenses without also being armed with a deadly weapon at the time of the crimes. We conclude that the trial court improperly found these two factors in aggravation based upon the same evidence. We therefore conclude that defendant is entitled to a new sentencing hearing on his convictions for burglary and kidnapping.*

*Kyle*, 333 N.C. at 705, 430 S.E.2d at 422 (emphasis added) (citation omitted).

In defendant's case, evidence he possessed a knife at the victim's apartment was used to support the court's findings both that defendant was armed (9.a.) and that he used a deadly weapon in perpetrating his attack on the victim (9.b.). The victim testified defendant was armed when he first made contact with her; she "immediately . . . felt a cold substance on [her] neck," and he subsequently threatened to kill her if she did not comply with his demands. In addition, she testified he used the knife during the commission of the rape: he forced her legs open, and "he [was] holding what I [felt] to be a knife with his left hand . . . ." Thus defendant *used* a knife in the commission of second degree rape from his initial entry into the victim's room until his departure. Under *Kyle*, defendant's use of a deadly weapon presupposes he was armed with it at the time. Therefore, the court erroneously used the same evidence to prove two distinct factors in enhancing defendant's sentence.

"[W]here an aggravating factor was incorrect, the trial judge could not have properly balanced the aggravating and mitigating factors . . . ." *State v. Taylor*, 74 N.C. App. 326, 328, 328 S.E.2d 27, 29, *disc. review denied*, 314 N.C. 547, 335 S.E.2d 319 (1985); *see also State v. Davy*, 100 N.C. App. 551, 560, 397 S.E.2d 634, 639, *disc. review denied, appeal dismissed*, 327 N.C. 638, 398 S.E.2d 871 (1990). Accordingly, the case must be remanded for resentencing. *Davy*, 100 N.C. App. at 560, 397 S.E.2d at 639. As our Supreme Court has stated:

> [I]t must be assumed that every factor in aggravation measured against every factor in mitigation, with concomitant weight attached to each, contributes to the *severity* of the sentence — the quantitative variation from the norm of the presumptive term. It is only the sentencing judge who is in a position to re-evaluate the severity of the sentence imposed in light of the adjustment. For these reasons, *we hold that in every*

*case in which it is found that the judge erred in a finding or findings in aggravation and imposed a sentence beyond the presumptive term, the case must be remanded for a new sentencing hearing.*

*State v. Ahearn*, 307 N.C. 584, 602, 300 S.E.2d 689, 701 (1983) (second emphasis added); *see also State v. Chatman*, 308 N.C. 169, 180-81, 301 S.E.2d 71, 78 (1983).

While this may well be one of the "many cases where, on remand, the trial judge will properly reach the same result absent the erroneous finding," *Ahearn*, 307 N.C. at 602, 300 S.E.2d at 700-01, defendant is entitled to understand the basis for the court's decision to sentence him to a term beyond that presumptively imposed by law.

Having thus fully examined each of defendant's assignments of error, we find no prejudicial error in the guilt phase of his trial. However, for the reasons discussed hereinabove, we remand for resentencing the charge of second degree rape.

89 CRS 39361, Counts I & II—No error in the trial.

89 CRS 39361, Count I—Remand for resentencing.

Judges EAGLES and MARTIN concur.